**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VANGUARD OUTDOOR, LLC, a
California limited liability
company,
             *Plaintiff-Appellant,*

v.

CITY OF LOS ANGELES, a California
municipal corporation,
             *Defendant-Appellee.*

No. 10-56635

D.C. No.
2:08-cv-06035-
ABC-JWJ

ORDER

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, Chief District Judge, Presiding

Argued and Submitted
May 2, 2011—Pasadena, California

Filed June 3, 2011

Before: John T. Noonan and Kim McLane Wardlaw, Circuit
Judges, and Edward R. Korman, Senior District Judge.*

---

**COUNSEL**

Benjamin P. Pugh (argued) and James S. Azadian, Enterprise
Counsel Group ALC, Irvine, California, for the plaintiff-
appellant.

---

*The Honorable Edward R. Korman, Senior District Judge for the U.S.
District Court for the Eastern District of New York, Brooklyn, sitting by
designation.

Carmen A. Trutanich, Kenneth T. Fong (argued), Michael J. Bostrom, and Kim Rodgers Westhoff, Los Angeles City Attorney's Office, Los Angeles, California, for the defendant-appellee.

## ORDER

We affirm for the reasons stated by the district court in its September 27, 2010 Amended Order Re: Plaintiffs' Motion to Amend Complaint; Motion for a Preliminary Injunction, attached as Appendix A.

**AFFIRMED.**

**APPENDIX A**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANGUARD OUTDOOR, LLC, a California limited liability company, | CASE NO.: CV 08-6035 ABC (JWJx) |
| Plaintiff, | AMENDED ORDER RE: PLAINTIFFS' MOTION TO AMEND COMPLAINT; MOTION FOR A PRELIMINARY INJUNCTION |
| v. | |
| CITY OF LOS ANGELES, a California municipal corporation, | |
| Defendant. | |

Pending before the Court is Plaintiff Vanguard Outdoor, LLC's ("Plaintiff's") Motion for a Preliminary Injunction (Docket No. 37) and Motion to Amend Complaint (Docket No. 40), filed on September 9, 2010, pursuant to leave of Court.[1] Defendant City of Los Angeles (the "City") opposed both motions on September 16, 2010 (Docket Nos. 45, 46), and Plaintiff replied on September 21, 2010 (Docket Nos. 48, 49.) The Court finds these matters appropriate for resolution without oral argument and will not hear argument at the September 27, 2010 hearing.

[1]This Amended Order supercedes the Court's prior Order issued on September 24, 2010. (Docket No. 51.)

Fed. R. Civ. P. 78; Local Rule 7-15.  The parties are still ORDERED to appear before the Court on Monday, September 27, 2010 at 11:00 a.m. for a status conference.  After considering the case file and extensive briefing in this matter, the Court DENIES Plaintiff's motion for a preliminary injunction and DENIES AS MOOT Plaintiff's motion to amend because Plaintiff may amend its complaint without leave.

**BACKGROUND**

Plaintiff is a billboard company attempting to salvage litigation to maintain three signs in the City, even after the Ninth Circuit has twice in the last two years rebuffed First Amendment challenges to the City's attempts to control sign proliferation throughout the City of Los Angeles.  See World Wide Rush, LLC v. City of Los Angeles, 606 F.3d 676 (9th Cir. 2010); Metro Lights, LLC v. City of Los Angeles, 551 F.3d 898 (9th Cir. 2009).  This case was one of many "copycat" lawsuits filed after this Court in World Wide Rush enjoined the City's enforcement of its ban on offsite and supergraphic signs as an invalid prior restraint on speech under the First Amendment and enjoined enforcement of the City's Freeway Facing Sign Ban as a fatally underinclusive restriction on commercial speech.  See World Wide Rush, 606 F.3d at 683-84.  After that decision, "well-traveled thoroughfares that contained any sort of sizable building were soon pockmarked with Supergraphic Signs."  World Wide Rush, LLC v. City of Los Angeles, 605 F. Supp. 2d 1088, 1092 (C.D. Cal. 2009), rev'd, 606 F.3d at 689.

The Ninth Circuit reversed the judgment on both grounds, holding that the City's offsite and supergraphic sign bans were not prior restraints on speech and that two exceptions to the Freeway Facing Sign Ban did not so undermine the City's stated interests in safety and aesthetics to violate the First Amendment.  World Wide Rush, 606

F.3d at 687—89.  In the real world, that decision should have resolved litigation in most, if not all, of the billboard cases.  In the world of billboard litigation, however, that was apparently an invitation simply to be more creative.

Filed on September 15, 2009, this case involves supergraphic signs at three locations: 10924 Le Conte Avenue, Los Angeles, California 90024; 3000 South Robertson Boulevard, Los Angeles, California 90034; and 5858 Wilshire Boulevard, Los Angeles, California 90036.  The Court stayed litigation in this case pending the appeal in World Wide Rush, and while that stay was in place, the Court effectively enjoined the City from enforcing the offsite and supergraphic sign bans, as well as the Freeway Facing Sign Ban, against Plaintiff's supergraphic signs at those three locations. (Docket No. 13.)

Once the Ninth Circuit's mandate issued in World Wide Rush, the Court ordered the parties in all the billboard cases to file joint status reports outlining what remained after that decision.  (Docket No. 16.)  Plaintiff in this matter urged the Court to maintain the current injunction so it might amend its complaint and seek a preliminary injunction based on claims that, in its view, were not decided by the Ninth Circuit in World Wide Rush.  The Court agreed to allow Plaintiff to file those motions, which are now pending.

Meanwhile, on May 4, 2010, the City instituted a civil enforcement action and, on July 9, 2010, instituted a criminal misdemeanor complaint against Plaintiff and others involving one of the sign properties at issue here.  Those cases remain pending in state court.

Plaintiff recognizes that the foundation of its claims in its

3

original complaint has been fatally undermined by the Ninth Circuit's World Wide Rush decision.  (Docket No. 21 at 4 (admitting that "Vanguard itself did not previously assert [the proposed new] claims in this case because its complaint was based on the same claims of the then-successful complaint in the World Wide Rush case." (emphasis in original).)  Therefore, Plaintiff has moved to amend its complaint to allege the following claims, which it believes were not resolved by the World Wide Rush decision: (1) declaratory relief under the First and Fourteenth Amendment because section 14.4.4.B.9, 14.4.4.B.11, and 14.4.6 of the City's sign ordinance and the entire California Outdoor Advertising Act are facially unconstitutional and unconstitutional as applied to Plaintiff; (2) declaratory relief pursuant to California Constitution, Article I, section 1, because the sign ordinance and the California Outdoor Advertising Act violate the California Constitution's free speech clause; and (3) a claim by proposed additional Plaintiff EJLC Robertson, LLC (apparently Vanguard's principal and sole employee), that the City's actions directed at Plaintiff's sign at 3000 South Robertson Blvd. constitute a taking without just compensation under the California and Federal Constitutions.  In addition and notwithstanding the decision in World Wide Rush, Plaintiff's proposed new complaint has, in fact, repeated many of the allegations rejected by the Ninth Circuit.

Beyond simply breathing life back into this case by filing an amended complaint, Plaintiff has also moved for a preliminary injunction, ostensibly to extend the injunction against enforcement of the offsite and supergraphic sign bans at Plaintiff's three sign locations.  Specifically, Plaintiff seeks preliminary injunctive relief on three grounds: (1) that the City applies the supergraphic

4

and offsite sign bans to improperly prohibit Plaintiff's signs, while allowing other signs, and that the City impermissibly distinguishes between offsite and onsite signs, all in violation of Plaintiff's Fourteenth Amendment equal protection rights; (2) that, whatever the reach of the Federal Constitution, the California Constitution's free speech clause does not tolerate a distinction between non-commercial and commercial speech that would allow the City to prohibit Plaintiff's signs; and (3) that the City's "aesthetics" rationale is a pretext for content-based regulation of offsite and supergraphic signs.

As the Court outlines below, Plaintiff has failed to demonstrate that its federal claims have any merit in light of World Wide Rush and Metro Lights. Similarly, Plaintiff's claim that the California Constitution affords greater protection than the First Amendment fails in light of California Supreme Court case law. As a result, Plaintiff has failed to show even serious questions on the merits of its claims, which alone defeats its request for a preliminary injunction. However, because the City has not filed a responsive pleading, Plaintiff is entitled to file its amended complaint without leave from the Court. At the status conference, the parties should be prepared to discuss the next steps in this case in light of the Court's ruling herein.

**MOTION FOR PRELIMINARY INJUNCTION**

**A.     Legal Standard**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of hardships tips in his favor, and that an injunction is in

the public interest." Winter v. Natural Res. Defense Council, Inc., __ U.S. __, __, 129 S. Ct. 365, 374 (2008). This recitation of the requirements for a preliminary injunction did not completely erase the Ninth Circuit's "sliding scale" approach, which provided that "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." Alliance for Wild Rockies v. Cottrell, __ F.3d __, __, 2010 WL 3665149, at 4* (9th Cir. Sept. 22, 2010). In one version of the "sliding scale," "a preliminary injunction could issue where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor." Id. (brackets in original). This "serious questions" test survived Winter. Id. at *4–5. Therefore, "'serious questions going to the merits' and a hardship balance that tips sharply in the plaintiff's favor can support issuance of an injunction, so long as the plaintiff also shows a likelihood of irreparable injury and that the injunction is in the public interest." Id. at *8.

Importantly, a preliminary injunction may be denied on the sole ground that the plaintiff has failed to raise even "serious questions" going to the merits. See Guzman v. Shewry, 552 F.3d 941, 948 (9th Cir. 2009) ("[A]t an irreducible minimum, the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation."). If the Court so concludes, it need not address the other preliminary injunction factors. See Advertise.com, Inc. v. AOL Advertising, Inc., __ F.3d __, __, 2010 WL 3001980, at *7 (9th Cir. Aug. 3, 2010).

6

**B.    Discussion**

Before addressing each claim on which Plaintiff rests its request for an injunction, the Court will briefly summarize the decisions in World Wide Rush and Metro Lights.

    1.    World Wide Rush

The plaintiff in World Wide Rush raised two claims: first, the plaintiff raised an as-applied claim that the Freeway Facing Sign Ban was an unconstitutionally underinclusive ban on commercial speech under Central Hudson Gas & Electric Corp. v. Public Services Commission, 447 U.S. 557 (1980), "because the City had, in fact, permitted some freeway facing billboards despite the Ban"; and second, the plaintiff claimed that the City's blanket bans on supergraphic and offsite sign bans were facially unconstitutional as prior restraints on speech because exceptions to the bans vested the City Council with unbridled discretion to select among preferred speakers without objective criteria. World Wide Rush, 606 F.3d at 683. The Court noted that the plaintiff had not initially raised a Central Hudson challenge to the supergraphic and offsite sign bans, id., and rejected the plaintiff's attempt to raise the issue on appeal, id. at 689–90.

For the Freeway Facing Sign Ban, the court explained that a four-part test must be applied to assess a Central Hudson challenge:

> (1) if the communication is neither misleading nor related to unlawful activity, then it merits First Amendment scrutiny as a threshold matter; in order for the restriction to withstand such scrutiny, (2) the State must assert a substantial interest to be achieved by restrictions on commercial speech; (3) the restriction must directly advance the state interest involved; and (4) it must not be more extensive than is necessary to serve that interest.

Id. at 684 (internal quotation marks and alterations omitted) (quoting

Metro Lights, 551 F.3d at 903). The City's substantial interests in safety and aesthetics were unquestionably advanced by restrictions on billboards, so the critical question was whether the City "'denigrates its interest in . . . safety and beauty and defeats its own case by permitting' freeway facing billboards at the Staples Center and in the Fifteenth Street SUD [Supplemental Use District] while forbidding other freeway facing billboards." Id. at 685 (ellipsis in original) (quoting Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 510—11 (1981)). "'To put it in the context of the Central Hudson test, a regulation may have exceptions that undermine and counteract the interest the government claims it adopted the law to further; such a regulation cannot directly and materially advance its aim,' and is, therefore, unconstitutionally underinclusive." Id. (quoting Metro Lights, 551 F.3d at 905).

The court found that two exceptions to the City's Freeway Facing Sign Ban did not so undermine the City's interests in safety and aesthetics as to render the ban unconstitutionally underinclusive. Id. at 685—87. The court urged judicial deference to a "'municipality's reasonably graduated response to different aspects of a problem'" and directed that a "holistic" approach must be taken when assessing exceptions to the ban, rather than looking at each exception in isolation. Id. at 685. The court found that the exception for the Staples Center actually furthered the City's interests because it was intended to remove blight and dangerous conditions from downtown Los Angeles; similarly, the exception for the Fifteenth Street SUD furthered the City's interests because it improved traffic flow on Santa Monica Boulevard and resulted in a net reduction in signs. Id.

The court then distinguished Greater New Orleans Broadcasting

Ass'n, Inc. v. United States, 527 U.S. 173, 190–93 (1999), because that case involved a prohibition on advertising for gambling in private casinos while allowing advertising for gambling on reservations, which simply channeled gamblers to the reservations instead of advancing the government's interests asserted in the case. Id. at 686. The exceptions to the Freeway Facing Sign Ban did not channel the evils sought to be eliminated elsewhere; they were entirely consistent with the City's asserted interests. Id. The court also rejected the plaintiffs' reliance on other cases, including Ballen v. City of Redmond, 466 F.3d 736, 743 (9th Cir. 2006), because those cases involved content-based distinctions for commercial speech, and the Freeway Facing Sign Ban, as well as the exceptions, were content-neutral. Id. The court reasoned that Metro Lights was more apposite because, as in that case, where the City's interest in controlling the proliferation of signs by disparate private parties was served by limiting signs to one party over which the City wielded contractual control, the City's decision to allow some signs at the Staples Center and within the Fifteenth Street SUD could serve a similar purpose. Id.

The court was similarly unpersuaded by the plaintiff's facial unfettered discretion challenge to the offsite and supergraphic sign bans, which granted the City the prerogative to create special plans and SUDs and to enter development agreements. Id. at 687–89. The exceptions were not susceptible to the plaintiff's unfettered discretion challenge because they involved the City's "regular and well-recognized legislative power to regulate land use." Id. at 688. This legislative authority, which was granted to the City elsewhere and did not arise from the offsite and supergraphic sign bans,

therefore did not implicate a prior restraint concern under the First Amendment. Id. at 688–89.

### 2. Metro Lights

Metro Lights involved a Central Hudson underinclusivity attack on the City's ban on offsite signs that exempted signs at transit stops and allowed the City to enter a contract with a sign company to install thousands of signs at transit stops. 551 F.3d at 901. Because the parties did not dispute that the advertising was lawful and that the City had substantial interests in traffic safety and aesthetics that supported the offsite sign ban, the court analyzed the challenge under Central Hudson's third and fourth elements, namely, "whether the City's restriction 'directly advances' the government interest and whether the City's restriction is narrowly tailored to its aim." Id. at 904. The court answered both questions affirmatively.

With respect to advancing the City's interest, the court noted that the inquiry must focus on "whether the City's ban advances its interest in its general application, not specifically with respect to Metro Lights." Id. It recognized that a ban may be unconstitutionally underinclusive under Central Hudson when it has "exceptions that 'undermine and counteract' the interest the government claims it adopted the law to further" because "such a regulation cannot 'directly and materially advance its aim.'" Id. at 905. The court then interpreted the Supreme Court's underinclusivity decisions in Greater New Orleans and other cases to bar regulations in two situations: (1) first, if the exception ensures that the regulation will fail to achieve its end, it does not materially advance its aim; and (2) second, exceptions that make distinctions

among different kinds of speech must relate to the interest the government seeks to advance. Id. And the fourth Central Hudson element of narrow tailoring does not demand that the government use the least restrictive means to further its ends. Id. at 906.

The court undertook a lengthy analysis of the Supreme Court's decision in Metromedia, Inc. v. City of San Diego, 453 U.S. 490 (1981), which upheld a ban on offsite commercial billboards, and found it dispositive on the third element under Central Hudson. Id. at 907-11. Importantly, both Metromedia and Metro Lights emphasized deference to the reasonable judgment of City officials to value one type of commercial advertising — onsite signs — over another type of commercial advertising — offsite signs; indeed, the court in Metro Lights explained that Metromedia "exudes deference for a municipality's reasonably graduated response to different aspects of a problem." Id. at 907-08, 910.

The court concluded that the contract between the City and the sign provider that allowed thousands of signs at transit stops did not fatally undermine the City's interests in traffic safety and aesthetics for several reasons: first, the sign ban still achieved its aim to reduce signage in the city, id. at 910; second, the contract gave the City power to control a single sign provider and exclude others at transit stops, which prevented numerous disparate parties from posting signs, id.; and third, the City's judgment that its interests in a complete ban on signage should yield to controlled signage at transit stops was a "classically legislative decision" approved by Metromedia, id. at 910-11. In the end, unlike Greater New Orleans, the City's contract did not work at "inexorable cross-purposes" with the interests in banning signs because "a regime that

11

combines the Sign Ordinance and the [contract] still arrests the uncontrolled proliferation of signage and thereby goes a long way toward cleaning up the clutter, which the City believed to be a worthy legislative goal." Id. at 911.

The court also found the City's effectively partial ban on signage was narrowly tailored to its interests mainly because, if a total ban was permissible, as Metromedia indicated, then a partial ban must also be, and the supervision of a single sign provider at transit stops could plausibly contribute to the interests in visual coherence and aesthetic quality. Id. at 911–12. Importantly, as the court in World Wide Rush did, the court rejected the plaintiff's reliance on the Ninth Circuit's decision in Ballen because neither the sign ban nor the transit stop exception were content-based, and if based upon the identity of the speaker, the sign provider "doesn't say anything; it only sells space to advertisers who say things." Id. at 912.

### 3. The Law After World Wide Rush and Metro Lights

Several points can be gleaned from the decisions in World Wide Rush and Metro Lights. First, the City's sign ban can withstand a Central Hudson attack so long as it is not "so pierced by exceptions and inconsistencies," as to directly undermine the City's interests in traffic safety and aesthetics. World Wide Rush, 606 F.3d at 686. And those exceptions cannot be viewed in isolation or parsed too finely; the exceptions must be looked at holistically in the context of the entire regulatory scheme. Id. at 685-86. Second, a Central Hudson challenge is not focused on the particular plaintiff; instead, the Court must look at the "whether the City's ban advances its interests in its general application, not specifically with respect to" a particular speaker. Metro Lights, 551 F.3d at 904. Third, the court

must defer to the reasonable legislative judgements of the City on how best to advance its own interests in aesthetics and traffic safety. Id. at 910. To combat the proliferation of supergraphics that have blanketed the City, the City may take a graduated response, even going so far as granting exceptions for thousands of signs over which it can exercise control. Id. at 910. That response unquestionably includes exercising its classically legislative function of creating exceptions to the sign bans for SUDs and development agreements, so long as those judgments are reasonable in light of the City's interests. World Wide Rush, 606 F.3d at 687–88.

        4.   Plaintiff's Equal Protection Claims

Recognizing the barriers now erected for its First Amendment claims, Plaintiff argues that it still can pursue an as-applied equal protection claim, albeit resting on Central Hudson. Because Plaintiff is not a member of a suspect class, its equal protection claim is subject to rational basis review unless its fundamental right of free speech is implicated. See Rubin v. City of Santa Monica, 308 F.3d 1008, 1019 (9th Cir. 2002). Plaintiff does not contend that the City's regulations fail rational basis review, so the dispositive issue is whether Plaintiff has demonstrated a violation of its speech rights.

Plaintiff is correct that World Wide Rush did not address an as-applied Central Hudson challenge to the City's offsite and supergraphic sign bans. See 606 F.3d at 687–88. It now attempts to mount that as-applied challenge on three grounds: (1) no tolerable distinction exists between approved supergraphic signs and Plaintiff's prohibited supergraphic signs; (2) no tolerable distinction exists between approved offsite signs and Plaintiff's prohibited offsite

13

signs; and (3) no tolerable distinction exists between permitted onsite signs and Plaintiff's prohibited offsite signs.  These claims lack merit under World Wide Rush and Metro Lights.

          a.    Ban on Supergraphic Signs

Plaintiff argues that the City impermissibly distinguishes between its supergraphic signs (which are prohibited) and identical supergraphic signs elsewhere in the City (which may be permitted). Plaintiff admits, however, that the permitted supergraphic signs are located within City-created "Signage Supplemental Use Districts or other special property development projects," and its own signs are not.  Because all the supergraphic signs to which Plaintiff points to substantiate this claim are located within SUDs or approved through special property development projects, Plaintiff's claim fails.

In World Wide Rush, the Ninth Circuit rejected an unfettered discretion challenge to the exceptions in the sign ordinance that allowed the City to create SUDs, to enact special plans, and enter into development agreements because those exceptions derived from the City's "regular and well-recognized legislative power to regulate land use."  606 F.3d at 688.  In turn, Metro Lights explained that if an exception itself is permissible, "[i]t would be strange, then, if the prohibition suddenly violated the Constitution because the municipality made use of such an exception."  551 F.3d at 909 n.12. The court wondered: "How can it be constitutional to make an exception to a law, but unconstitutional for the exception to operate in practice?"  Id.  If the City can validly enact SUDs to permit signs, then certainly it may constitutionally permit sign owners to erect signs in those districts without running afoul of Central Hudson.  And Plaintiff's conclusory argument that the City arbitrarily draws the

14

lines to create SUDs cannot save this claim, as the City's line-drawing is assuredly a "classically legislative function" within the meaning of both Metro Lights and World Wide Rush. Moreover, the creation of SUDs is indistinguishable from the entering of a contract over advertising at transit stops, as in Metro Lights, as both involve the City's discretion to take a measured legislative response to sign proliferation. Therefore, Plaintiff has not raised even serious questions that its speech rights were violated if the City allows supergraphics in SUDs, while prohibiting Plaintiff's signs located outside of SUDs.

### b. Ban on Offsite Signs

In contrast to its challenge to the supergraphic sign ban, Plaintiff points to offsite signs not within any SUDs that have allegedly been permitted by the City, even though Plaintiff claims they should have been prohibited just as their own offsite signs were. Plaintiff submits photographs of three offsite supergraphic signs it claims should not be permitted under the sign ban: signs on the Westwood Medical Plaza Building (Anderson Decl., Exs. 25—29); signs atop the Wilshire La Brea Building (Anderson Decl., Ex. 24); and signs on the outer walls of the Beverly Center (Anderson Decl., Ex. 31). Plaintiff buttresses this showing by submitting photographs of seven "mural" signs, which Plaintiff claims are actually signs that pose precisely the same risks as supergraphic signs, but were permitted anyway. (Anderson Decl., Exs. 37—44, Anderson Supp. Decl., Exs. 6—16.)

The City researched these signs and provided evidence that all of them had some sort of permits, most of which predated the current supergraphic sign ban enacted in 2002. (Zamparini Decl. ¶¶ 3—4, Exs.

15

1-10.)  Plaintiff quibbles with this evidence, claiming that, among other points, the current signs are not the types of signs that were originally permitted and that some of the signs were permitted under old regulations that would have prohibited the signs at the time.[2]

This claim fails for multiple reasons.  First, as an evidentiary matter, the City has demonstrated that Plaintiff's signs are different from the signs to which Plaintiff points, as those signs were permitted and most of them predated the offsite sign ban, while Plaintiff's were not permitted and did not predate the ban.  The City is certainly entitled to treat signs permitted before the offsite and supergraphic sign bans differently than other signs both because preserving legally nonconforming billboards still "'furthers the [City's] significant interest in reducing blight and increasing traffic safety,' even if all billboards are not eliminated," and because the City may have to pay the owners to take legal nonconforming billboards down.  See Maldonado v. Morales, 556 F.3d 1037, 1048 (9th Cir. 2009) (rejecting equal protection claim of billboard owner on this ground).

Second, to implicate the First Amendment in an underinclusivity claim, Plaintiff must demonstrate that, when "'evaluated in the context of the entire regulatory scheme,'" the ban on signs is "so pierced by exceptions and inconsistencies," as to be unconstitutionally underinclusive.  World Wide Rush, 606 F.3d at 686. Plaintiff's showing comes nowhere close to meeting this standard. Even if Plaintiff's evidence could create an inference of

[2]Plaintiff claims it can provide other examples of signs that should be prohibited but are allowed, although the Court presumes that Plaintiff has put its best evidence forward, after being given multiple opportunities to do so.

16

discrimination at the ten locations cited, Plaintiff has pointed to only ten locations in a City of thousands of billboards. The City could have validly chosen to permit these signs because they improved urban blight in the area (as with Hotel Figueroa) or were consistent with the commercial character of the location (as with the Beverly Center), which simply represents the City's judgment that its interests in allowing (but controlling) the posting of signs in these places outweighs the City's interests in traffic safety and aesthetics. If neither allowing thousands of signs at transit stops, as in Metro Lights, nor channeling signs from one part of the City to another to reduce signage, as in World Wide Rush, undermines the City's interest in reducing sign proliferation, then the ten signs to which Plaintiff points likewise do not implicate Central Hudson.

To paraphrase World Wide Rush, Plaintiff has not demonstrated that this handful of exceptions "break[s] the link between the [offsite] Sign Ban and the City's objectives in traffic safety and aesthetics." Id. at 687. Plaintiff has failed to raise serious questions on this claim.

### c. Onsite/Offsite Distinction

Plaintiff further argues that the City's distinction between Plaintiff's prohibited offsite signs and permitted onsite signs violates Plaintiff's rights. The distinction between offsite and onsite signs has been repeatedly upheld as content-neutral and valid. See Metromedia, 453 U.S. at 511; Clear Channel Outdoor, Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir. 2003) ("The Supreme Court, the Ninth Circuit, and many other courts have held that the on-site/off-site distinction is not an impermissible content-based regulation."). Plaintiff relies on Foti v. Menlo Park, 146 F.3d 629,

636 (9th Cir. 1998), and Ballen v. City of Redmond, 466 F.3d 736, 744 (9th Cir. 2006), to suggest that the onsite/offsite distinction in the area of supergraphic and offsite signs must be considered content-based. However, Foti predated Clear Channel and Ballen, both of which reaffirmed the Supreme Court's decision in Metromedia that the distinction is not, in fact, content-based. To the extent Plaintiff has relied on comments in Ballen that Metromedia's offsite/onsite distinction was unique to the law of "fixed" billboards, the court in Metro Lights had no trouble applying Metromedia to the City's offsite sign ban and the court in World Wide Rush had no trouble applying Metromedia to the Freeway Facing Sign Ban, and both courts rejected the application of Ballen in this context. Therefore, Plaintiff has not demonstrated serious questions on this claim.

d.    Lax Safety Enforcement

Plaintiff further argues that the City's concern about the safety of supergraphic signs is merely a guise for favoring some speakers over others: "Vanguard has demonstrated that there is simply no logical reason to conclude that the same supergraphics appearing outside a City-carved SUD are more dangerous (or more distracting) that similarly situated supergraphic signs that are found within an SUD." (Mot. 25.) Of course, this contention fails for the same reason Plaintiff's challenge to the City's supergraphic sign ban fails, that is, because the City is permitted to create SUDs, the act of allowing billboards in SUDs also passes constitutional muster.

Nevertheless, Plaintiff appears to be mounting an attack on the City's enforcement of safety rules directly related to the civil and criminal actions against Plaintiff in state court. To be frank, most of Plaintiff's arguments in support of this point are inscrutable.

18

From what the Court can glean, Plaintiff offers only five photographs of signs it claims are violating the same safety rules it has been cited for, but that have not also been cited. (Anderson Decl., Exs. 8—9, 13, 19—20.) Beyond that, Plaintiff appears to be attempting to litigate in this Court the safety issues involved in the state-court proceeding. The Court declines to wade into that dispute and finds that Plaintiff has not demonstrated that the City's safety enforcement record against other sign companies demonstrates a pretext for discrimination against Plaintiff for exercising its speech rights. At most, the City may not be enforcing the safety regulations against all sign companies at all times, but that alone does not create an inference of invidious discrimination. Town of Atherton v. Templeton, 198 Cal. App. 2d 146, 155 (Ct. App. 1961) (laxity of enforcement alone is insufficient to demonstrate a violation of equal protection); see also People ex rel. Dept. of Pub. Works v. Golden Rule Church Ass'n, 49 Cal. App. 3d 773, 777 (Ct. App. 1975) (rejecting billboard owner's discriminatory enforcement argument because, "[e]ven if it were assumed that other known violators have not been prosecuted, this factor alone would not establish the existence of illegal discrimination."). Plaintiff has not raised serious questions on this claim.

     5.   California Constitutional Claim

Plaintiff challenges the City's supergraphic and offsite sign bans on the ground that they violate the California constitutional guarantee of free speech. Cal. Const. art. I, § 2. Plaintiff relies on dicta in a California Supreme Court decision that suggests, unlike the First Amendment, the California Constitution does not afford any lesser protection to commercial speech than non-commercial speech.

19

Plaintiff reasons that the banning of supergraphic offsite signs, a prohibition on commercial speech, would not withstand scrutiny under the California Constitution. Cf. Gerawan Farming, Inc. v. Lyons, 24 Cal. 4th 468, 497 (2000). Indeed, as a general matter, "the California liberty of speech clause is broader and more protective than the free speech clause of the First Amendment." See Los Angeles Alliance for Survival v. City of Los Angeles, 22 Cal. 4th 352, 366 (2000). The City argues that a decision after Gerawan, Kasky v. Nike, Inc., 27 Cal. 4th 939, 959 (2002), recognized that the protections for commercial speech under the California Constitution are co-terminus with the protections under the First Amendment. Kasky, 27 Cal. 4th at 959. The City also claims that, notwithstanding any distinction between commercial and noncommercial speech or any greater protection afforded by the California Constitution, the California Constitution requires the Court to apply the same standard as the First Amendment for content-neutral time, place, and manner restrictions like the supergraphic and offsite sign bans. See Los Angeles Alliance for Survival, 27 Cal. 4th at 364-65. In the City's view, then, the supergraphic and offsite sign bans would pass muster under the California Constitution as content-neutral restrictions.

The Court will follow Kasky, which defeats Plaintiff's argument that the protections for commercial speech under the California Constitution are different than the protections under the First Amendment. In that case, the California Supreme Court addressed whether allegedly false statements by a corporation could be subject to false advertising and unfair competition claims without running afoul of either the First Amendment or the California Constitution. Kasky, 27 Cal. 4th at 946. In order to decide the question, the court

20

had to determine whether the speech at issue was commercial or non-commercial because "commercial speech receives a lesser degree of constitutional protection than many other forms of expression, and because governments may entirely prohibit commercial speech that is false or misleading." Id. The court extensively analyzed the distinction between commercial and non-commercial speech under the First Amendment, id. at 951–58, and explained that the scope of the free speech clause in the California Constitution was co-extensive with the First Amendment: "[t]his court has never suggested that the state and federal Constitutions impose different boundaries between the categories of commercial and noncommercial speech," id. at 959 (emphasis in original). The court cited the dicta from Gerawan that Plaintiff relies on, namely, that the free speech clause of the California Constitution is at least as broad in scope as the First Amendment, but the court nevertheless drew a distinction in Kasky between protection for commercial speech and non-commercial speech in order to determine whether the defendant's false advertising was actionable. Id.

The court then extensively analyzed the issue under the First Amendment and concluded that the defendant's allegedly false advertising was commercial speech that could be subject to false advertising and unfair competition claims without violating the First Amendment. Id. at 960–69. Importantly, the court also reached the same conclusion under the California Constitution in a brief passage, explaining that, "[i]n the few cases in which this court has addressed the distinction between commercial and non-commercial speech, we have not articulated a separate test for determining what constitutes commercial speech under the state Constitution, but instead we have

21

used the tests fashioned by the United States Supreme Court." Id. at 969. Thus, the court's holding under the First Amendment was dispositive of the issue under the California Constitution. Id.

In light of Kasky, Plaintiff's argument that enhanced protection exists for commercial speech under the California Constitution is unpersuasive and Plaintiff's California constitutional claim fails for the same reasons his First Amendment claims fail. Plaintiff has not raised serious questions on the merits of this claim to justify issuance of a preliminary injunction.

6.   "Aesthetics" as Pretext for Discrimination

Plaintiff argues that the City's aesthetics rationale is a pretext for discriminating against it because the City has allowed other, similar signs, but has prohibited Plaintiff's signs. This conclusory argument rests on the same exceptions to the sign bans identified above, and, for the reasons already discussed, it also fails.

D.   Conclusion and Stay[3]

Plaintiff has not raised even serious questions on the merits of any of its claims. Because that defeats its request for a preliminary injunction, the Court need not address any other factor and the motion is DENIED. See Advertise.com, 2010 WL 3001980, at *7; Guzman, 552 F.3d at 948. The Court previously dissolved the present injunction in light of this Order. (Docket No. 51.) The portion of the Court's prior Order dissolving the injunction is VACATED.

At a status conference on Monday, September 27, 2010, Plaintiff

_____

[3]Although the Court raised the issues of Younger and Pullman abstention, the Court need not address those issues. The City is free to raise them again at a later time. The Court will not enjoin the state court proceedings, as Plaintiff requests.

requested that the Court refrain from dissolving the present injunction for twenty-one days to provide it the opportunity to move for a stay of the Court's order pending an immediate appeal. The Court granted the request and set the following briefing schedule on a motion to stay:

- Plaintiff must file its motion **no later than Monday, October 4, 2010**.
- The City may oppose no later than **Tuesday, October 12, 2010**, but, to the extent the City can file its opposition by Friday, October 8, 2010, that would greatly expedite the Court's resolution of the issue.
- Plaintiff may file a reply **no later than Thursday, October 14, 2010**.

A hearing on this matter may be held on **Monday, October 18, 2010 at 10:00 a.m.**, but the Court will notify the parties if the Court will resolve the issue without holding oral arguments on that date.

### MOTION TO AMEND

Federal Rule of Civil Procedure 15(a) provides that a party may amend once "as a matter of course" within twenty-one days after the pleading is served if no responsive pleading is allowed, or twenty-one days after service of either a responsive pleading or a motion under Rule 12(b), (e), or (f), whichever is earlier. Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

The City did not file a Rule 12(b) motion or an answer before this case was stayed and still has not filed a responsive pleading.

Therefore, Plaintiff may file its amended complaint without leave of Court.  Plaintiff's motion to amend is DENIED AS MOOT.

**IT IS SO ORDERED.**

DATED:      **9/27/10**

*Audrey B. Collins*
_____

**AUDREY B. COLLINS**

**UNITED STATES DISTRICT JUDGE**

24