**PARAMOUNT CONTRACTORS AND DEVELOPERS, INC., et al., Plaintiffs,**

v.

**CITY OF LOS ANGELES, a California municipal corporation, Community Redevelopment Agency of the City of Los Angeles, Defendants.**

Case No. CV 08–5653 ABC (PLAx).

United States District Court, C.D. California.

Aug. 2, 2011.

Douglas E. Mirell, William Michael Brody, Loeb and Loeb LLP, Los Angeles, CA, for Plaintiffs.

Michael J. Bostrom, Office of the City Attorney, Los Angeles, CA, for Defendants.

## ORDER RE: DEFENDANT CITY OF LOS ANGELES'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

AUDREY B. COLLINS, Chief Judge.

Pending before the Court is the City of Los Angeles's (the "City's") Motion to Dismiss Second Amended Complaint ("SAC"), filed on February 28, 2011. (Docket No. 72.) Plaintiffs Paramount Contractors and Developers, Inc., et al. (collectively "Paramount") opposed on March 14, 2011 and the City replied on March 21, 2011. The Court heard oral argument on April 18, 2011. Following argument, the Court stayed this case while an appeal in a related case was pending. (Docket No. 85.) That appeal was dismissed as moot on May 25, 2011, and the parties stipulated to a schedule for supplemental briefing and submitted additional briefs on the impact of that ruling. (Docket Nos. 88, 89, 91, 94.) Notwithstanding that schedule, Paramount filed an unauthorized sur-reply brief on July 27, 2011, which was stricken as improper. (Docket No. 99.) With the extensive briefing from the parties, the Court found that no further oral argument was necessary and vacated the August 1, 2011 hearing date. (Docket No. 95.) For the reasons below, the Court GRANTS the City's motion in its entirety and DISMISSES this case WITH PREJUDICE.

## BACKGROUND

### I. Procedural Background

Like many similar companies, Paramount is a "supergraphic" sign company "attempting to salvage litigation to maintain [two] signs in the City, even after the Ninth Circuit has twice in the last two years rebuffed First Amendment challenges to the City's attempts to control sign proliferation throughout the City of Los Angeles." *Vanguard Outdoor, LLC v. City of Los Angeles*, 648 F.3d 737, 738 (9th Cir.2011) (citing *World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676 (9th Cir.2010) and *Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898 (9th Cir.2009)). Paramount would like to erect and maintain "supergraphic" signs at two locations in Los Angeles: 6464 and 6565 West Sunset Boulevard (the "Sunset Properties"). It has brought two lawsuits to compel the City to allow it to do so, based largely on claimed First Amendment violations. The first suit, *Paramount Contractors & Developers, Inc. v. City of Los Angeles*, No. CV 07–159 ABC (JWJx) (C.D.Cal. filed on Jan. 1, 2007) (*"Paramount I "*), was resolved by summary judgment in the City's favor on June 6, 2008. Paramount appealed that ruling on June 20, 2008.

The instant case was filed on August 28, 2008, alleging essentially the same facts and claims as in *Paramount I*, and alleging that, around June 23, 2008, Paramount "submitted applications to the City for the right to maintain supergraphics on the Sunset Properties," but the City "refused to accept the applications or to process

them." (Docket No. 1, Compl. ¶ 11.) Paramount filed its FAC on October 26, 2010, attacking almost every aspect of the City's current and former sign regulations. In a lengthy Order, the Court granted in part and denied in part the City's motion to dismiss the FAC, and Paramount filed a Second Amended Complaint ("SAC") to address the infirmities identified by the Court.

In the meantime, the City moved to dismiss the appeal in *Paramount I* as moot because the original sign regulation challenged in that case had been amended in September 2010 to prohibit all supergraphic signs with limited exceptions, none of which applied to Paramount. The Ninth Circuit agreed and dismissed the appeal as moot.

In the unpublished memorandum disposition, the court explained that any claims for declaratory and injunctive relief were moot because a September 2010 amendment to the Hollywood Signage Supplemental Use District (the "Hollywood SUD") prohibited new supergraphic signs and eliminated both the sign reduction program in the Hollywood SUD and the City's delegation of authority to the Community Redevelopment Agency ("CRA") to negotiate exceptions to that program in exchange for certain fees. The court also rejected Paramount's argument that it had live claims for damages "because Paramount, for strategic reasons, disavowed damages before the district court." While Paramount had argued that the disavowal was only intended to cover "past damages" and that it could still pursue damages arising between this Court's June 2008 summary judgment and the September 2010 amendment to the Hollywood SUD, the court disagreed in light of Paramount's admission that it "has acknowledged that it is not seeking damages in this action."

Importantly, the court reasoned that, "[i]n any event, Paramount is not able to demonstrate that any alleged damages it incurred after the district court's order resulted from application of the provisions of the Hollywood SUD challenged in the complaint." The court also rejected the possibility that attorney's fees created a live controversy where none otherwise existed.

After this disposition, the parties briefed its impact in this case, as well as the impact of *Vanguard,* a third published decision in a similar case rejecting challenges to the City's regulations of supergraphic signs.

## II. Allegations in the SAC[1]

In dismissing most of the FAC, the Court ruled that only the following claims remained live: (1) claims for damages directed at the Original Hollywood SUD; (2) as-applied claims that the City allowed some signs as exceptions to the Amended Hollywood SUD; (3) as-applied claims directed at the City's general Sign Ordinance; (4) equal protection claims of discriminatory treatment; and (5) takings claims. (Docket No. 67.) In the SAC, Paramount retreads much of the same ground as in the FAC, albeit with some clearer explanation of the nature of its remaining claims.

### A. Sign Locations

As relevant here, Paramount has provided more information for its allegations that some companies have been approved to erect supergraphic and other signs in the Hollywood SUD and elsewhere, even though those signs should have been subject to the same conditions as Paramount's signs, which were prohibited:

---

1. The Court has already explained in detail the factual underpinnings of this case in dismissing the FAC and need not explain it all again here.

1. The City issued permits in January 2011 for supergraphic signs on the Hollywood Metropolitan Hotel at 5825–5827 Sunset Blvd. in the Hollywood SUD without requiring the developers of the site to comply with the sign take-down or reduction program in the Original Hollywood SUD. (SAC ¶ 49(a)(1).) Paramount claims that the developers were allowed a 1–to–35 take-down ratio, were permitted to use non-standard materials, and were given a twenty-year permit, which doubled the length of a standard permit. (*Id.*) Paramount claims that these allowances were more lenient than those the City required of it and that the City found these supergraphic signs, which were similar to Paramount's signs, would have no negative impact on the visual environment. (*Id.*)

2. In July 2010, the City permitted supergraphic signs on the "W" Hotel at 6250 W. Hollywood Blvd. and the Legacy Apartments at 1600 N. Vine St. in the Hollywood SUD by allowing variances without compliance with the take-down or in lieu fees under the Original Hollywood SUD. (SAC ¶ 49(a)(2).)

3. On November 17, 2010, the City permitted CBS Outdoor to erect supergraphic signs at 6725 Sunset Blvd. in the Hollywood SUD, which Paramount alleges was "in compliance with the City's sign regulations." (SAC ¶ 49(a)(3).)

4. In 2010, the City permitted supergraphic signs on the building at 6933 W. Hollywood Blvd. in the Hollywood SUD without requiring the company to comply with the sign reduction program in the Original Hollywood SUD and requiring the company to pay only $39,000 as an "in lieu" fee, which contrasted with the $1.2 million required from Paramount. (SAC ¶ 4 9(a)(4).)

5. The City permitted supergraphics at the L.A. Live Complex in 2009, which is not within the Hollywood SUD. (SAC ¶ 49(a)(5).)

6. The City recently allowed supergraphic signs at 7021 Hollywood Blvd. in the Hollywood SUD. (SAC ¶ 49(a)(6).)

7. In 2009 and 2010, the City permitted supergraphic signs on the Marriot/Ritz Carlton downtown, which is not within the Hollywood SUD. (SAC ¶ 49(a)(7).)

8. As recently as December 2010, the City approved supergraphic signs at 6200 W. Hollywood Blvd. in the Hollywood SUD, but "may not have" required the owner to take down its own signs, instead giving credit for taking down others' signs, and may have granted variances to erect more signs than would have been allowed under the Original Hollywood SUD.

9. In October 2008, the City and the CRA permitted supergraphic signs at 1480 Vine St./6290 Hollywood Blvd. for CIM, allowing CIM to pay a smaller "in lieu" fee than Paramount under the sign reduction program in the Original Hollywood SUD. (SAC ¶ 49(a)(9).) The City's Planning Department found that CIM's signs would not negatively impact the visual environment, even though they were similar to Paramount's. (*Id.*)

10. In August 2010, the City permitted supergraphic signs at 1724 Highland Blvd. in the Hollywood SUD. (SAC ¶ 49(a)(10).)

11. On May 21, 2010, the City permitted CIM to erect a "roof sign" at 6904 W. Hollywood Blvd. in the Hollywood SUD, which Paramount claims was akin to a supergraphic sign, but was not required to comply with the Original Hollywood SUD's restrictions on supergraphics. (SAC ¶ 49(a)(11).)

12. In February 2011, the City entered a settlement agreement with CBS Outdoor regarding four properties (1025 Highland Ave., 939 S. Figueroa St., 6253 Hollywood Blvd., and 115 W. Washington Blvd.) and permits for three of these properties were deemed to be vested under the Amended

Hollywood SUD, which allowed CBS Outdoor to erect signs at those locations. (SAC ¶ 49(a)(12).)

13. The City permitted three illuminated supergraphic signs at 1800 Highland Ave. on February 10, 2011, pursuant to a project approved by the CRA in November 2008, which contained exceptions to the Original Hollywood SUD's take-down requirements. (SAC ¶ 49(a)(13).)

14. The CRA "recently" approved supergraphic signs at 5939 Sunset Blvd. in the Hollywood SUD. (SAC ¶ 49(a)(14).)

15. The City "has allowed supergraphics to be maintained" at 1735 Vine St. in the Hollywood SUD. (SAC ¶ 49(a)(15).) (FAC ¶ 49(a).)

## B. Free Speech Claims

Paramount once again advances various free speech claims, identifying ten reasons why the City's Sign Regulations, including the Sign Ordinances and the Original and Amended Hollywood SUDs have violated Paramount's free speech rights:

1. Paramount's first claim is an as-applied challenge under *Central Hudson*[2] to the Original Hollywood SUD because the City applied it to Paramount but did not apply it to ban other companies' supergraphic signs. (SAC ¶ 62(1).) Paramount alleges that any ban on supergraphic and offsite signs in the Original Hollywood SUD, including signs subject to the Sign Reduction Program, failed to advance the City's goals because the City granted numerous permits that worked at cross-purposes with the stated reasons for the ban and irrationally distinguished speakers. (SAC ¶ 62(1)(a)-(b).) Further, the ban on

supergraphics signs was underinclusive because other types of signs, such as digital signs, roof top signs, and billboards, were permitted and have become prevalent in the Hollywood SUD. (SAC ¶ 62(1)(c).)

2. Paramount's second claim is an as-applied *Central Hudson* challenge to the City's Sign Regulations because they granted irrational exceptions to the supergraphic and offsite sign bans in the same way as alleged in claim one, above.

3. Paramount's third claim is an as-applied *Central Hudson* challenge to the Amended Hollywood SUD for the same reasons as noted above, based on signs allowed after the November 17, 2010 effective date of the Amended Hollywood SUD. (SAC ¶ 62(3).)[3] Paramount points to four such locations for supergraphic signs that have been permitted at 6200 Hollywood Boulevard, 5825 West Sunset Boulevard, 6725 Sunset Boulevard, and 1800 North Highland Avenue, all within the Hollywood SUD. (*Id.*) Paramount claims that the City will also allow fifteen additional supergraphic signs pursuant to a "grandfathered" provision in the Amended Hollywood SUD. (*Id.*)

4. Paramount's fourth claim advances an as-applied "unbridled discretion" challenge that the Original Hollywood SUD gave city officials unfettered discretion to permit or prohibit speech. (SAC ¶ 62(4).) Particularly, the Original Hollywood SUD's "sign reduction program" allowed officials to grant permits to projects that would have been "beneficial" to the area, but did not also create standards to allow for judicial review. (*Id.*) The "as-applied" portion of this claim states in total: "In

2. *Central Hudson Gas & Elec. Corp. v. Pub. Servs. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

3. The Court previously dismissed Paramount's *Central Hudson* claim directed at the Amended Hollywood SUD because all of the

alleged exceptions were granted before the Amended Hollywood SUD took effect in November 2010. (Docket No. 67 at 27–28.) The Court granted Paramount leave to amend to allege exceptions to the Amended Hollywood SUD.

contrast to other parties, City administrators refused to even process or review Paramount's applications and knowingly subjected it to the delegated whims of CRA officials, knowing that other parties were receiving more favorable treatment." (*Id.*) [4]

5. Paramount's fifth claim sets forth an as-applied "unbridled discretion" challenge that the Amended Hollywood SUD does not set objective guidelines for allowing supergraphic signs and perpetuates prior discriminatory decisions by creating "grandfathered," "tolling," and "vesting" exceptions to the blanket ban on supergraphic signs. (SAC ¶ 62(5).) Particularly, Paramount claims that there are no objective standards to interpret and apply the terms "substantial liabilities," "substantial work," or "good faith reliance," which are used to determine whether the "grandfathered" and "vesting" exceptions in the Amended Hollywood SUD apply to a particular sign. (*Id.*) Paramount points to several supergraphic signs that have fallen within these exceptions: three supergraphics at 1800 Highland Avenue; supergraphics at 5825–5827 Sunset Boulevard; and supergraphics at 6725 Sunset Boulevard and other properties on behalf of CBS Outdoor, Inc. (*Id.*)

6. Paramount's sixth claim asserts an as-applied First Amendment challenge to the Original and Amended Hollywood SUDs because they favor large companies who own billboard structures and could afford to take down some signs under the sign removal program or purchase "takedown rights" from other entities, which resulted in viewpoint discrimination against speakers who could not afford to participate in the program. (SAC ¶ 62(6).)

7. Paramount's seventh claim alleges an as-applied First Amendment challenge

to the Original Hollywood SUD because the "in lieu" fee required to erect supergraphic signs was an "illegal charge for, and tax on, speech" that carried no standards to fix the amount of fees. (SAC ¶ 62(7).)

8. Paramount's eighth claim asserts an as-applied First Amendment challenge to actions by the City in ignoring Paramount's permit requests and allowing City officials to influence the permitting process in favor of other entities. (SAC ¶ 62(8).) Particularly, Paramount claims that the City allowed officials in the Planning Department, the Department of Building Safety, the Fire Department, and the Hollywood Community Redevelopment Agency (the "CRA") to deny Paramount's permit applications, while accepting others' applications for similar signage. (*Id.*)

9. Paramount's ninth claim asserts the same speech claims against the Original and Amended Hollywood SUDs as outlined above, but under the California Constitution's protection of commercial speech. (SAC ¶ 62(9).)

10. Finally, Paramount's tenth claim seeks a declaration that Paramount's permit applications should be deemed "vested" and "grandfathered" under the Amended Hollywood SUD because, but for the unlawful denial of permits under the Original Hollywood SUD, Paramount could take advantage of those provisions to obtain permits. (SAC ¶ 62(10).)

## C. Equal Protection and Takings Claims

Based on the same set of facts, Paramount also advances equal protection and takings claims. Paramount's equal protection claims rest on essentially the same

---

4. The parties' additional briefing following the dismissal of the appeal in *Paramount I* focused on this claim.

allegations as its free speech claims, i.e., that similarly situated sign companies have been given permits to erect supergraphic signs on different terms than those offered to Paramount. (SAC ¶ 71.) Paramount's takings claim alleges an "as-applied" challenge that the City imposed conditions on Paramount's permit requests that had no nexus with any legitimate interest of the City. (SAC ¶ 82.) Among the fees and other requirements, the City demanded that Paramount dedicate a portion of the Sunset Properties for public use as a parking structure, construct another level of parking "presumably for public use," and maintain a certain "class" of tenants and quality to its building, "also presumably for the public's benefit." (*Id.*)

## LEGAL STANDARD

■ A complaint survives a motion to dismiss under Rule 12(b)(6) if it contains a "short and plain statement of the claim showing that the pleader is entitled to relief," which does not require "detailed factual allegations," but it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). A claim must be "plausible on its face," which means that the Court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.; see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In other words, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (internal quotations and alterations omitted). Allegations of fact are taken as true and construed in the light most favorable to the nonmoving party. *See Newdow v. Lefevre*, 598 F.3d 638, 642 (9th Cir.2010),

*cert. denied,* —— U.S. ——, 131 S.Ct. 1612, 179 L.Ed.2d 501 (2011).

In analyzing the sufficiency of the complaint, the Court must first look at the requirements of the causes of action alleged. *See Iqbal,* 129 S.Ct. at 1947. The Court may then identify and disregard any legal conclusions, which are not subject to the requirement that the Court must accept as true all of the allegations contained in the complaint. *Id.* at 1949. The Court must then decide whether well-pleaded factual allegations, when assumed true, "plausibly give rise to an entitlement to relief." *Id.* at 1950. In doing so, the Court may not consider material beyond the pleadings, but may consider judicially noticeable documents, documents attached to the complaint, or documents to which the complaint refers extensively or which form the basis of the plaintiff's claims in the complaint. *See United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir.2003).

## DISCUSSION

The City has moved to dismiss all of Paramount's claims on various grounds, each of which is discussed below. However, both parties have requested judicial notice of documents to support their positions, and the Court addresses those requests first.

### I. Requests for Judicial Notice

#### A. *City's Request*

■ In an effort to defeat Paramount's allegations that it was treated differently than the owners of supergraphic signs at certain identified addresses, the City seeks judicial notice of, inter alia, documents related to the sign and permit approvals for those locations. (City's Feb. 28, 2011 Supp. Request for Judicial Notice ("RJN"), Exs. 1–6, 8–9, 11, 15.) The City claims that these documents are public records properly subject to judicial notice, *see San-*

ta Monica Food Not Bombs v. City of Santa Monica, 450 F.3d 1022, 1025 n. 2 (9th Cir.2006), and may be considered on a motion to dismiss because they are incorporated into the SAC by reference, see Ritchie, 342 F.3d at 908.

The Court disagrees. First, even if the Court could judicially notice the documents relating to permit approvals as public records, that notice only extends as far as noticing that the documents exist; the Court may not take notice of the truth of the contents of those documents, since the contents are subject to vigorous dispute. See id. at 909 (reasoning that "[c]ourts may take judicial notice of some public records, including the 'records and reports of administrative bodies,'" but not all public records fit into this exception, especially when the information in the records is disputed); Troy Group, Inc. v. Tilson, 364 F.Supp.2d 1149, 1152 (C.D.Cal.2005) (denying request for judicial notice of " 'court documents provided for the truth of the facts asserted therein' when such documents contain 'facts essential to support a contention in a cause then before it.'"). A large portion of Paramount's case turns on the propriety of the City's permit approvals for other sign companies. Therefore, while the Court may take notice that these documents exist, the Court may not assess their truth in resolving the instant motion.

Second, these documents do not fall within the "incorporation by reference" doctrine. On a motion to dismiss, a court may consider documents not attached to the complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim," Ritchie, 342 F.3d at 908, and " 'whose authenticity no party questions,'" Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir.2005). However, Paramount "does not concede" the authenticity of the documents (Opp'n to City's Feb. 28, 2011 Supp. RJN 2) because it has no way to verify that these

documents are, in fact, what the City claims they are without conducting discovery.

Further, while Paramount referred to permit approvals for the sign locations in the SAC, those allegations are not so "extensive" to mandate incorporating those documents into the SAC. "Extensively" referring to a document occurs, for example, "when a plaintiff's claim about insurance coverage is based on the contents of a coverage plan ... or when a plaintiff's claim about stock fraud is based on the contents of SEC filings ...." Ritchie, 342 F.3d at 908. Here, absent discovery, Paramount has alleged, at most, a partial picture of the permit approvals at various locations; it has no access to emails, correspondence, notes, draft approvals, etc., that might paint a fuller picture of the permitting process at these locations. These documents are therefore not properly considered at the motion to dismiss stage and the City's request for judicial notice of them is DENIED.

■ The City also requests judicial notice of several court records: a petition for a writ of mandamus and mandate filed in Los Angeles Superior Court in Regency Outdoor Advertising, Inc. v. City of Los Angeles, et al., Case No. BS121645 (L.A.Super. Ct., filed July 1, 2009); and a stipulation and proposed judgment in People v. CBS Outdoor Inc., Case No. BC454211, 2011 WL 346914 (Cal.Super. Ct., filed on Feb. 1, 2011). (City's Feb. 28, 2011 Supp. RJN, Exs. 7, 10.) As with public records, the Court may judicially notice the existence of court records, but it may not notice the truth of their content. See Wyatt v. Terhune, 315 F.3d 1108, 1114 & n. 5 (9th Cir.2003); Lee v. Cty. of Los Angeles, 250 F.3d 668, 689–90 (9th Cir. 2001).

The City explains that the writ in the Regency Outdoor case was offered merely

to show that a dispute exists between Regency and the City as to the take-down credits at the 6200 Hollywood Blvd. location, which does not implicate the truth of any facts in that filing and is a proper subject of judicial notice. Moreover, the City explains that the settlement agreement and judgment in the *CBS Outdoor* case were offered to rebut Paramount's claim that the City "gave away" sign rights as part of that settlement because the settlement agreement contains no such term. The Court may judicially notice the existence of terms included in the settlement agreement, which is not subject to reasonable dispute. Thus, the Court GRANTS judicial notice of these two documents for these purposes.

Paramount does not dispute that several other exhibits offered by the City are subject to judicial notice, such as the Los Angeles Sports and Entertainment Complex Specific Plan; section 271 of the City's Charter; and a February 24, 2011 letter to the City from Paramount. (City's Feb. 28, 2011 Supp. RJN, Exs. 12–14). Paramount also does not object to the City's request for judicial notice of the Ninth Circuit mandate in *Paramount I;* the transcript of oral argument on appeal in *Paramount I;* the CRA Amended Design for Development of Signs in Hollywood; the April 28, 2008 Statement of Genuine Issues from *Paramount I;* and the Declaration of Bradley Folb filed in response to the motion to dismiss the appeal in *Paramount I.* (City's June 30, 2011 RJN, Exs. A–E.) The Court GRANTS the City's request as to these documents.

### B. *Paramount's Requests*

■ Paramount requests judicial notice of photographs of signs erected throughout the City and drawings of proposed projects that would include supergraphic signs. (Paramount's March 14, 2011 RJN, Exs. A–I.) However, all of these documents are subject to reasonable dispute as to their authenticity and the accuracy of their content. *See Ritchie,* 342 F.3d at 909. Thus, the Court DENIES Paramount's request for judicial notice of these documents. The Court may, however, take judicial notice of a photograph submitted by the City of a building located at 1800 Highland Avenue. (City's March 21, 2011 Supp. RJN, Ex. 16.) As will be discussed *infra,* the only relevance of this exhibit is to show that the building has a split facade, which is not subject to dispute.

In support of its supplemental briefing on the effect of the resolution of *Paramount I,* Paramount submitted 15 additional exhibits, but did not request judicial notice of them. (Paramount's June 17, 2011 RJN.) All but one appear to be court documents, so the Court GRANTS judicial notice of them within the parameters discussed above. (*Id.,* Exs. A–N.) One exhibit is a 2007 letter from the City to Paramount's former counsel. (*Id.,* Ex. O.) The City has not disputed its contents, so the Court GRANTS judicial notice of that document as well.

## II. Motion to Dismiss

### A. *Claim 1: As–Applied Central Hudson Challenge to the Original Hollywood SUD*

For its first claim, Paramount alleges a *Central Hudson* challenge to the Original Hollywood SUD that boils down to a claim that the City's interests in traffic safety and aesthetics are undermined by numerous exceptions granted under the Original Hollywood SUD. The Court previously dismissed as moot all of Paramount's claims for injunctive relief against the repealed Original Hollywood SUD, leaving only damages claims directed at the Original Hollywood SUD. (Docket No. 67 at 13–15.)

The City moves to dismiss this claim for damages on two grounds. First, Para-

mount's remaining claims for damages directed at the Original Hollywood SUD fail because Paramount cannot allege that its own speech rights were violated. Therefore, it may not recover damages for purely economic harm from not being able to enter contracts with advertisers to erect commercial supergraphic signs. Second, Paramount has not stated a claim that the exceptions to the Original Hollywood SUD so undermined the City's interests served by limiting supergraphic signs that the City has violated *Central Hudson*. While the City's first argument fails, the City is correct that Paramount is unable to state a *Central Hudson* underinclusivity claim.

### 1. Damages for Violations of Paramount's Own Speech Rights

■ Given that Paramount may only recover damages for its remaining claims against the Original Hollywood SUD, the City invokes three cases to argue that the nature of Paramount's business model—erecting commercial signs for advertisers for a fee—prevents Paramount from recovering damages for a violation of its *own* speech rights. *See Outdoor Media Group, Inc. v. City of Beaumont*, 702 F.Supp.2d 1147, 1161–63 (C.D.Cal.2010); *see also Pitt News v. Fisher*, 215 F.3d 354, 365–66 (3d Cir.2000); *Warner Cable Commc'ns, Inc. v. City of Niceville*, 911 F.2d 634, 638–40 (11th Cir.1990). Using a broad brush, the City paints this authority (especially *Outdoor Media*) as holding that, because Paramount profits from allowing advertisers to use its sign locations for a fee, Paramount's own speech rights have not been violated in any way that gives rise to damages for First Amendment violations. The Court is not convinced that this line of authority defeats Paramount's damages claims for this reason.

In *Outdoor Media*, sign companies that leased outdoor advertising space to the public sought but were denied permits to erect four billboards. 702 F.Supp.2d at 1150. The city repealed the ordinance on which the denials were based, and, after appeal and remand, the companies' only remaining claims against the repealed ordinance were for damages. *See Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 906 (9th Cir.2007). The district court granted summary judgment to the city on those claims because it found that, under the facts of the case, the companies no longer had any First Amendment interest in their billboards—they had "sold all of their rights and interest in the permit application to Lamar, a comparable outdoor advertising company, thereby relinquishing their position as the purported owners and operators of the unbuilt billboards." *Outdoor Media*, 702 F.Supp.2d at 1157. As a result, the only remaining harm to the companies was the "purely economic" harm of a lowered contract price for the sale of the sign permits; they could not point to any "expressive conduct they planned to undertake" but could not because of the city's prohibition. *Id.* at 1162–63.

Unlike this case, the facts in *Outdoor Media* were unique: there, the sign company had conveyed its rights to erect signs, so the only injury truly at stake was the value of the contract to sell those rights to another speaker. Here, by contrast, Paramount maintains control of the advertising content of its supergraphic signs—albeit for paying commercial customers—so its own ability to erect signs has been implicated by the City's alleged actions. *See Preferred Commc'ns, Inc. v. City of Los Angeles*, 754 F.2d 1396, 1410 n. 10 (9th Cir.1985) (explaining that cable operators, theater owners, booksellers, and concert promoters all control the content of their speech, but "[t]heir First Amendment protection is not diminished because they distribute or present works created

by others."), *aff'd,* 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986).

The court in *Outdoor Media* relied on, inter alia, *Pitt News* and *Warner Cable,* but, like *Outdoor Media,* those cases are also distinguishable from the circumstances here. In *Warner Cable,* for example, the court rejected a First Amendment challenge to a municipal ordinance that allowed the city to operate its own cable system in direct competition with the plaintiff/private cable operator, which seriously undermined the private cable provider's economically competitive position in the market, but imposed no direct burden on the operator's right to speak. *See* 911 F.2d at 638 ("What the City's ordinance does abridge is the continuation of Warner's profitable position as the only speaker in the captive cable market" which was an "economic loss," not a *"first amendment injury."* (emphasis in original)). Similar to *Warner Cable, Pitt News* involved a challenge to a law that prohibited certain advertising for alcohol in a college newspaper, which created a severe economic burden on the newspaper, but imposed no direct burden on the newspaper's speech rights. 215 F.3d at 366. Here, by contrast, the Original Hollywood SUD imposed a direct burden on sign companies like Paramount, preventing them from erecting any commercial supergraphic signs without meeting certain conditions. This was not simply an economic side-effect of a regulation like those in *Warner Cable* and *Pitt News,* which were not directed at curtailing the plaintiffs' speech.[5]

Also, *Warner Cable* and *Pitt News* did not deal with the " 'law of billboards,' " which is a " 'method of communicating ideas ... unto itself.' " *World Wide Rush v. City of Los Angeles,* 606 F.3d 676, 684 (9th Cir.2010). Indeed, to support its "economic damages" theory in the context of limits on commercial signs, the City has identified only *Outdoor Media* among scores of cases in the 30 years since the Supreme Court decided the seminal commercial-billboard case.[6] It is curious that no other commercial signage case has addressed this issue before now and the Court finds the contention unpersuasive.

2. *Sufficiency of Paramount's Central Hudson Allegations Against the Original Hollywood SUD*

■■ Paramount must satisfy four elements in order to allege an as-applied *Central Hudson* claim:

(1) if the communication is neither misleading nor related to unlawful activity, then it merits First Amendment scrutiny as a threshold matter; in order for the restriction to withstand such scrutiny, the State must assert a substantial interest to be achieved by restrictions on commercial speech; (3) the restriction must directly advance the state interest involved; and (4) it must not be more extensive than is necessary to serve that interest.

*World Wide Rush,* 606 F.3d at 684 (internal quotation marks and alterations omitted) (quoting *Metro Lights,* 551 F.3d at 903). When a party points to exceptions to a sign ban that allegedly undermine the interests to be served by the ban, the critical focus is whether the City " 'denigrates its interest in ... safety and beauty

---

5. Indeed, *Pitt News* is particularly unpersuasive here because the issue was decided on an appeal from the denial of a preliminary injunction, and in a later appeal from the grant of summary judgment to the defendants, the Third Circuit concluded that the law did, in fact, violate the newspaper's First Amend-

ment rights. *Pitt News v. Pappert,* 379 F.3d 96, 112 (3d Cir.2004) (distinguishing, inter alia, *Warner Cable* ).

6. *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 510–11, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981).

and defeats its own case by permitting'" some signs despite the ban, while forbidding others. *Id.* at 685 (ellipsis in original). "'To put it in the context of the *Central Hudson* test, a regulation may have exceptions that undermine and counteract the interest the government claims it adopted the law to further; such a regulation cannot directly and materially advance its aim,' and is, therefore, unconstitutionally underinclusive." *Id.* (quoting *Metro Lights,* 551 F.3d at 905).

■■ Regulations are fatally underinclusive under *Central Hudson* in two situations: first, if the exception ensures that the regulation will fail to achieve its end, then it does not materially advance its aim; and second, exceptions that make distinctions among different kinds of speech must relate to the interests the government seeks to advance. *Metro Lights,* 551 F.3d at 906. When assessing underinclusivity under the third *Central Hudson* prong, the Court focuses on "whether the City's ban advances its interest in its general application, not specifically with respect to" the plaintiff, *id.* at 904, and under the fourth *Central Hudson* prong of narrow tailoring, the Court need not require that the government use the least restrictive means to further its ends, *id.* at 906. In the end, the Court should defer to "a municipality's reasonably graduated response to different aspects of a problem." *Id.* at 910.

■ Paramount alleges that the City has granted permit approvals for signs in at least 15 different locations in and out of the Hollywood SUD, which demonstrate that the City unevenly enforces the Original Hollywood SUD, thereby undermining its goals in traffic safety or aesthetics. Similar claims were rejected in *World Wide Rush, Metro Lights,* and most recently in *Vanguard.*

In *World Wide Rush,* the court rejected an underinclusivity claim based upon two exceptions to the City's ban on billboards adjacent to freeways because those two exceptions did not so undermine the City's interests in safety and aesthetics as to render the ban unconstitutionally underinclusive. 606 F.3d at 685–87. The court urged judicial deference to a "'municipality's reasonably graduated response to different aspects of a problem'" and directed that a "holistic" approach must be taken when assessing exceptions to the ban, rather than considering each exception in isolation. *Id.* at 685. And when the court reviewed the exceptions at issue in that case, it found that they furthered the City's interests by, for example, removing blight and dangerous conditions and improving traffic flow and otherwise reducing signage. *Id.*

Setting out similar principles, *Metro Lights* also rejected a *Central Hudson* underinclusivity challenge to the City's ban on offsite signs and approved a contract with the City that allowed a sign company to install thousands of signs at transit stops. 551 F.3d at 901. The contract did not fatally undermine the City's interests in traffic safety and aesthetics for several reasons: first, the sign ban still achieved its aim to reduce signage in the City, *id.* at 910; second, the contract gave the City power to control a single sign provider and exclude others at transit stops, which prevented numerous disparate parties from posting signs, *id.;* and third, the City's judgment that its interests in a complete ban on signage should yield to controlled signage at transit stops was a "classically legislative decision," *id.* at 910–11. The City's contract did not work at "inexorable cross-purposes" with its interests served by banning signs because "a regime that combines the Sign Ordinance and the [contract] still arrests the uncontrolled proliferation of signage and thereby goes a long way toward cleaning up the clutter, which the City believed to be a worthy legislative goal." *Id.* at 911.

Finally, *Vanguard* addressed an under-inclusivity argument very close to Paramount's here. The court reviewed and synthesized *World Wide Rush* and *Metro Lights* and reached these conclusions:

> Several points can be gleaned from the decisions in *World Wide Rush* and *Metro Lights*. First, the City's sign ban can withstand a *Central Hudson* attack so long as it is not "so pierced by exceptions and inconsistencies," as to directly undermine the City's interests in traffic safety and aesthetics. And those exceptions cannot be viewed in isolation or parsed too finely; the exceptions must be looked at holistically in the context of the entire regulatory scheme. Second, a *Central Hudson* challenge is not focused on the particular plaintiff; instead, the Court must look at "whether the City's ban advances its interests in its general application, not specifically with respect to" a particular speaker. Third, the court must defer to the reasonable legislative judgements of the City on how best to advance its own interests in aesthetics and traffic safety. To combat the proliferation of supergraphics that have blanketed the City, the City may take a graduated response, even going so far as granting exceptions for thousands of signs over which it can exercise control. That response unquestionably includes exercising its classically legislative function of creating exceptions to the sign bans for SUDs and development agreements, so long as those judgments are reasonable in light of the City's interests.

*Vanguard*, 648 F.3d at 743.

The court then rejected the sign company's claims. As relevant here, the sign company had argued that the City impermissibly distinguished between its prohibited supergraphic signs and identical but permitted supergraphic signs elsewhere in the City. *Id.* at 743–44. The claim failed because the permitted signs were located within approved SUDs or "special property development projects," and under *World Wide Rush* and *Metro Lights*, "[i]f the City can validly enact SUDs to permit signs, then certainly it may constitutionally permit sign owners to erect signs in those districts without running afoul of *Central Hudson*." *Id.* The sign company had also argued that the City permitted offsite signs at 10 locations not within any SUD that were similar to the plaintiff's signs. *Id.* at 744–45. The court rejected this argument not only because the City provided evidence that these signs had been permitted or approved before the offsite sign ban, but also because these exceptions "came nowhere near" demonstrating that the offsite sign ban was so pierced with exceptions as to render it fatally underinclusive. *Id.* at 744–45.

In light of these cases, then, Paramount must allege that the permitted signs rendered the Original Hollywood SUD " 'so pierced by exceptions and inconsistencies' as to be unconstitutionally underinclusive." *World Wide Rush*, 606 F.3d at 686. In considering this claim, the Court need not consider signs erected outside the Hollywood SUD because they cannot demonstrate that the City has undermined the specific interests advanced by the Original Hollywood SUD. *See Vanguard*, 648 F.3d at 743–45. The signs located at the following addresses are located within the Hollywood SUD: the Hollywood Metropolitan Hotel at 5825–5827 Sunset Blvd.; the "W" Hotel at 6250 W. Hollywood Blvd. and the Legacy Apartments at 1600 N. Vine St.; 6725 Sunset Blvd.; 6933 W. Hollywood Blvd.; 7021 Hollywood Blvd.; 6200 W. Hollywood Blvd.; 1480 Vine St./6290 Hollywood Blvd.; 1724 Highland Blvd.; 6904 W. Hollywood Blvd.; 1025 Highland Ave., 939 S. Figueroa St., 6253 Hollywood Blvd., and 115 W. Washington Blvd. (all owned by CBS Outdoor); 1800 Highland Ave.; 5939 Sunset Blvd.; and 1735 Vine St.

Even for the signs allowed within the Hollywood SUD, the Court may not parse these exceptions "too finely" and must view them in the context of the entire legislative scheme. *Vanguard,* 648 F.3d at 742–43. This principle is particularly important here because the Original Hollywood SUD did not completely ban supergraphic signs. Instead, it permitted supergraphic signs if other signs were removed pursuant to the sign reduction program or the owner entered an agreement with the CRA that contained "performance, one-time fee, or on-going revenue provisions that allow[ ] the CRA to undertake projects, programs or other activities that improve the visual environment in a redevelopment project area." (City's Nov. 17, 2010 RJN, Ex. 13 at 286, § 9.) This regulation therefore adopted a specific scheme—short of a complete ban—to advance the City's aesthetic and safety interests in the Hollywood SUD.[7] As a result, any sign company that complied with the Original Hollywood SUD—even if on terms more favorable than those offered to Paramount—advanced the City's interests and those signs cannot properly be considered "exceptions" that undermined the Hollywood SUD. When the locations are viewed in the context of the entire legislative scheme, the permitted signs alleged by Paramount come "nowhere near" demonstrating that the Original Hollywood SUD was so pierced with exceptions as to render it fatally underinclusive. *See Vanguard,* 648 F.3d at 744–45.

### 5825–5827 Sunset

Paramount alleges that some agreement existed between this property owner and the City to reduce signage, albeit on far less onerous terms than those offered to Paramount for its supergraphic signs. Paramount also alleges that the City concluded that these signs would not have "a negative impact on the visual environment," even though Paramount's similar supergraphic signs were not allowed.

These allegations do not undermine the City's interest in improving the visual environment through the Original Hollywood SUD. Indeed, this was not even an "exception" to the Original Hollywood SUD, but an example of enforcement of the requirement to reduce signage, even if on terms more favorable than those offered to Paramount. Just as the sign reduction requirement in the Original Hollywood SUD advanced the City's interest in improving the visual environment, so, too, did actually requiring the property owner to adhere to it. Similarly, the finding that the proposed signs at this location had no negative impact on the visual environment directly advanced the City's interest, even if Paramount's signs would similarly have had no negative impact on the visual environment. Viewing the alleged circumstances of the signage at this location as a whole, this arrangement in no way undermined the City's interest in improving the visual environment under the Original Hollywood SUD.

### 6250 W. Hollywood/1600 N. Vine (W Hotel/Legacy Apartments)

Paramount alleges that the City granted "variances" from the Hollywood SUD to the property owner at this location, which allowed a 200% increase in supergraphic sign area without a commensurate takedown requirement or "in lieu" fees. The

---

7. Paramount suggests in passing that the City has offered new "post hoc" reasons for granting exceptions under the Original Hollywood SUD, such as "blight removal," which differ from the City's original interests in traffic safety and aesthetics. But traffic safety and aesthetics are broad categories that could certainly include things like blight removal. *See World Wide Rush,* 606 F.3d at 686 (approving of exception to sign ban that may have improved "an otherwise dangerous and blighted downtown area.").

City responds by offering a document containing the findings supporting the CRA's approval of the project, which concluded that the area was blighted and the sign agreement was part of an agreement by the developer to invest hundreds of millions of dollars in the area. The Court has declined to take judicial notice of this document, so it cannot consider it in assessing Paramount's claims. Nevertheless, in allowing the supergraphic signs at this location, "[t]he City ... reasonably may have concluded that the benefits of redeveloping and attracting people to an otherwise dangerous and blighted ... area outweighed the harm of additional" supergraphic signs there. *World Wide Rush*, 606 F.3d at 686. Thus, this location does not demonstrate an "exception" that undermines the purposes of the Original Hollywood SUD.

### 6725 Sunset Blvd.

Paramount alleges that this sign complied with the City's sign regulations. Needless to say this does not plausibly allege an "exception" to support a *Central Hudson* underinclusivity claim.

### 6933 W. Hollywood Blvd.

Paramount alleges that the owner at this site was only required to pay a $39,000 fee to erect signs, while Paramount was charged $1.2 million in "in lieu" fees to erect their signs. The City relies on documents related to this site to argue that a billboard was required to be removed as well, but the Court has denied the City's request for judicial notice of these documents and they cannot be considered. Nevertheless, Paramount admits in its opposition that the property owner at this location was required to take down some signage. As discussed above, even if on more favorable terms that those offered to Paramount, the $39,000 fee and the take-down of even a minimal amount of signage advanced the City's interest in improving the visual environment under the Original Hollywood SUD.[8]

### 7021 Hollywood Blvd., 5939 Sunset Blvd., 1735 Vine St., & 1724 Highland Ave.

Paramount alleges only that supergraphic signs have been allowed at these locations. These bare allegations do not plausibly show a *Central Hudson* violation because the Original Hollywood SUD did not ban all supergraphic signs and these signs could have complied with the terms of the Original Hollywood SUD and advanced the City's interests. *See World Wide Rush*, 606 F.3d at 686.

### 6200 W. Hollywood Blvd.

Paramount alleges that the City approved supergraphic signs at this location and "may not have even required the property owners or developers to take down signs they owned, but instead gave credit for take-downs of disputed signs that another sign company ... claimed to own." The Court has taken judicial notice of the filing in the *Regency* case, which demonstrates that there is a dispute over who should receive the credits related to this location. As the City explains, no matter who prevails, the signs will be removed, which advances the City's interests under the Original Hollywood SUD and cannot show a plausible exception that undermines the City's interests.

### 1480 Vine St./6290 Hollywood Blvd.

Paramount alleges that the property owner at these sites entered an agreement with the CRA, which was approved by the City, in which the owner paid lower "in lieu" fees than those demanded from Para-

---

**8.** Paramount argues that there is no way to know what the $39,000 was spent on, but there is. One need only read the Original Hollywood SUD to know that the fee was to be used for "projects, programs, or other activities that improve the visual environment in a redevelopment project area." (City's Nov. 17, 2010 RJN, Ex. 13 at 286, § 9.)

mount. Paramount also alleges that the City's Planning Department concluded that these signs would not "harm the visual environment." Like the supergraphic signs at 5825–5827 Sunset Blvd., the fact that this owner complied with the Original Sign Ordinance, even if on more favorable terms than offered to Paramount, directly advances the City's interests and does not constitute an "exception" giving rise to a *Central Hudson* claim.

### 6904 W. Hollywood Blvd.

Paramount alleges that the owner at this site was permitted to erect a "3024–square–foot off-site open panel roof sign" at this location under an "exception" to the Original Hollywood SUD's take-down requirement "such that less signage would have to be taken down than required by the code" and the owner was not required to pay an "in lieu" fee. Paramount claims that an "open panel roof sign" is "in all relevant respects a 'supergraphic'" and that is why it undermined the City's interests. This is incorrect. An "open panel roof sign" is defined as "[a] type of roof sign consisting of Channel Letters, graphic segments, open lighting elements, or another open form which combines solid segments and transparent spaces." (City's Nov. 17, 2010 RJN, Ex. 13 at 267.) A "supergraphic" sign, by contrast, is "[a] sign, consisting of an image which is applied to and made integral with a wall, or projected onto a wall or printed on vinyl, mesh or other material," and which must be at least 1200 square feet in size. (*Id.* at 268, 282 § 5M.)

The City could readily conclude that massive mesh or vinyl supergraphic signs implicate different safety and aesthetic concerns than open-panel roof signs, so prohibiting the former while permitting the latter does not undermine its interest in regulating either one. Paramount's signs also were not considered "open panel roof signs" and Paramount may not challenge a provision that was never applied to it. *Get Outdoors II, LLC v. City of San Diego,* 506 F.3d 886, 892 (9th Cir.2007). And finally, even if Paramount were correct that its supergraphic signs and "open panel roof signs" were similar, Paramount alleged that at least some signage was taken down in order for the owner to erect this sign, which again advances the City's interests. This does not demonstrate a "exception" sufficient to state a *Central Hudson* claim.

### 939 S. Figueroa St., 6253 Hollywood Blvd., & 115 W. Washington Blvd.

Paramount alleges that CBS Outdoor was granted "vested" permits at these three locations as part of a state-court settlement. The Court has taken judicial notice of the settlement agreement and judgment filed in state court, which demonstrates that the signs deemed "vested" were painted wall signs erected before the City's 2002 ban on supergraphic and off-site signs, not supergraphic signs like Paramount's. (City's Feb. 28, 2011 Supp. RJN, Ex. 10 at 130.) Paramount's only response is that the judgment was "clearly collusive" (Opp'n 10), but it offers no explanation for this conclusory allegation. These allegations do not demonstrate an "exception" sufficient for a *Central Hudson* underinclusivity claim.

### 1800 Highland Ave.

Paramount alleges that the property owners at this location were permitted to "skirt the take-down requirements" and were exempted from limitations on having two signs on the same side of the property. The City offers documents to show that existing billboards and wall signs were required to be taken down, but these documents are not subject to judicial notice and the Court cannot consider them. Nevertheless, Paramount admits that "some number of signs did come down." (Opp'n

10.) The removal of this signage advanced the City's interests under the Original Hollywood SUD.

Paramount also complains that the owners at this site were allowed to erect two signs on one side of a building, when only one should have been allowed. The City explains that the facade of this building is split, such that a single sign would be split in two to be erected there. (City's March 21, 2011 Supp. RJN, Ex. 16.) Paramount did not seek any sort of exception like this and this minor exception compelled by the building's architecture does not undermine the City's interests.

### 3. Conclusion

Paramount has failed to plead that the alleged "exceptions" to the Original Sign Ordinance undermined the City's interests in aesthetics and improving the visual environment and, as a result, has not alleged that the Original Hollywood SUD was " 'so pierced by exceptions and inconsistencies' as to be unconstitutionally underinclusive." *World Wide Rush,* 606 F.3d at 686. Although Paramount alleges more generally that the City's interests are undermined by the "large number of supergraphics, digital signs, roof top signs, billboards and other signs in the Hollywood SUD" (SAC ¶ 62(1)(c)), if Paramount cannot state a *Central Hudson* underinclusivity claim with the specific locations identified above, then it also cannot do so with its vague allegations that other signs exist. *See Metro Lights,* 551 F.3d at 910–11. Thus, Paramount has failed to state a plausible *Central Hudson* underinclusivity claim against the Original Hollywood SUD and its first claim is DISMISSED WITH PREJUDICE.

### B. *Claim 2: As–Applied Central Hudson Challenge to the Sign Regulations*

This claim repeats allegations similar to those supporting Paramount's *Central Hudson* challenge to the Original Hollywood SUD, but Paramount supports this claim by pointing to only two "exceptions" to the City's general ban on supergraphic signs: the downtown "L.A. Live" complex and the downtown Marriott/Ritz Carlton hotel/condominium property. Paramount claims only that supergraphic signs were erected at those locations, but does not explain how they undermine the City's interests. Even so, the existence of two exceptions do not undermine the City's interests. *See World Wide Rush,* 606 F.3d at 685. Further, those properties are located within another SUD and the City is permitted to create different sign SUDs for different locations in the City and allow owners to erect signs in them. *See Vanguard,* 648 F.3d at *743–44; *World Wide Rush,* 606 F.3d at 688. The Court therefore DISMISSES this claim WITH PREJUDICE.

### C. *Claim 3: As–Applied Central Hudson Challenge to the Amended Hollywood SUD*

Effective November 17, 2010, the Amended Hollywood SUD bans all supergraphic signs in the Hollywood SUD except for projects with vested rights under California law and "grandfathered" projects approved on or before November 12, 2008 (the date of the first public hearing on the Amended Hollywood SUD). (SAC ¶ 36; City's Nov. 17, 2010 RJN, Ex. 9 at 197–98, § 6K.) Paramount's third claim is an as-applied *Central Hudson* challenge to the Amended Hollywood SUD based on many of the same "exceptions" discussed with relation to the Original Hollywood SUD, but which were allegedly permitted or erected after the November 17, 2010 effective date of the Hollywood SUD (e.g., 6200 Hollywood Blvd., 5825 W. Sunset Blvd., 6725 Sunset Blvd., and 1800 N. Highland Ave.). Paramount also claims that the City will allow 15 additional supergraphic signs pursuant to the "grandfa-

thered" provision in the Amended Hollywood SUD.

Paramount has made clear that this claim is based on the theory that the Amended Hollywood SUD "perpetuate[s] the very discretionary exceptions and variances granted under the Original Hollywood SUD" (Opp'n 18) because the City has used (and will use) the "grandfathered" and "vesting" exceptions to allow certain signs. However, because the Court has found that none of the cited exceptions undermines the City's interests sufficiently to implicate a *Central Hudson* challenge, there is nothing to "perpetuate" and there is no constitutional infirmity based on any signs alleged to have been permitted under the Amended Hollywood SUD. Moreover, these claims appear to be facial challenges because the City has never applied the Amended Hollywood SUD to Paramount, and the Court has already dismissed with prejudice all facial challenges to the Amended Hollywood SUD. (Docket No. 67 at 22–23.) Thus, the Court DISMISSES this claim WITH PREJUDICE.

### D. Claims 4 and 5: "As–Applied" "Unbridled Discretion" Challenges to the Original and Amended Hollywood SUDs

Paramount attempts to advance "as-applied" claims against the Original and Amended Hollywood SUDs on the grounds that they grant officials "unbridled discretion" to grant permit applications without objective and definite standards.

#### 1. Amended Hollywood SUD

 Paramount's challenge to the Amended Hollywood SUD fails because the "grandfathered" and "vesting" provisions are based on definite objective standards. The Amended Hollywood SUD allows supergraphic signs from projects that have vested rights under California law and projects that were approved on or before November 12, 2008 (the date of the first public hearing on the Amended Hollywood SUD). The Court already concluded that the "vesting" exception is not vague. (Docket No. 67 at 22.) In any case, there is no discretion to be exercised under these specific, definite criteria: either a proposed supergraphic sign complies with these provisions or it does not. This claim therefore must be DISMISSED WITH PREJUDICE.

#### 2. Original Hollywood SUD

 Paramount's unfettered discretion challenge to the sign reduction and "in lieu" fee requirements under the Original Hollywood SUD was the focus of the parties' additional briefing after the *Paramount I* appeal was dismissed. As the Court previously ruled, Paramount may only seek damages for any violation of its rights caused by the Original Hollywood SUD. Given this limitation, the parties dispute whether an "as-applied" "unbridled discretion" claim exists, or whether this type of claim must always be considered a facial challenge, and whether damages can be recovered as a legal matter for a facial "unbridled discretion" claim.[9] The parties

---

9. As a general matter, there are two types of facial free speech challenges. *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir.1998). "In the first type of facial challenge, the plaintiff argues that the ordinance could never be applied in a valid manner because it is unconstitutionally vague or it impermissibly restricts a protected activity." *Id.* "The second type of facial challenge is an exception to our general standing requirements: the plaintiff argues that the statute is written so broadly that it may inhibit the constitutionally protected speech of third parties, even if [the plaintiff's] own speech may be prohibited." *Id.* If either challenge is successful, the law is rendered invalid in all applications. *Id.* An as-applied challenge "contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others." *Id.* Therefore, "[a]n as-applied chal-

also raise various other arguments related to the preclusive effect of the decision in *Paramount I* on Paramount's damages claims here. The Court need not address any of these contentions because Paramount is unable to plausibly allege that the damages it incurred were the result of any unfettered discretion created by the Original Hollywood SUD, rather than a May 2010 state-court enforcement proceeding involving later bans applied to Paramount's supergraphic signs. Without plausible allegations of damages caused by the Original Hollywood SUD, Paramount's claims fail.

To state a 42 U.S.C. § 1983 claim for damages, a plaintiff must allege that the defendant's conduct was the actionable cause of its injuries, which includes allegations of both causation-in-fact and proximate causation. *See Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 216 F.3d 764, 783 (9th Cir. 2000), *aff'd* 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). A claim fails when there are "intervening causes that break the chain of proximate causation." *Van Ort v. Estate of Stanewich,* 92 F.3d 831, 837 (9th Cir.1996).

Paramount alleges that its permit applications for permanent supergraphic signs were rejected under the Original Hollywood SUD in August 2006 and again in June 2008. (SAC ¶¶ 23–26.) However, Paramount has repeatedly admitted that it continued to maintain its signs—and thus lost no revenue—up until May 2010, when it finally took those signs down in the face of threatened criminal and civil action in state court under the general Sign Ordinance's ban on new supergraphic signs, not the Original Hollywood SUD, which was not in effect at that time. For example, in opposing the motion to dismiss the appeal in Paramount I, Paramount's President Bradley Folb attested that "the City began rigorously enforcing, both civilly and criminally, its supergraphics 'bans'" through "a state court civil enforcement lawsuit filed against Paramount on May 4, 2010, seeking $5,000 per day for each sign displayed. As a result of the City's aggressive enforcement efforts, Paramount was forced to remove its signs and is no longer earning any advertising revenue." (City's June 30, 2011 RJN, Ex. E ¶ 5.) In support of the supplemental briefing here, Folb repeated this statement that Paramount incurred no damages until the City undertook these enforcement efforts in May 2010. (Folb Decl. ¶ 5.)

Moreover, in the current supplemental briefing, Paramount argued that its waiver of damages in *Paramount I* should not preclude damages in this case because, at the time of the judgment in *Paramount I,* "Paramount had not yet suffered any damages, and therefore could not identify them in response to the City's interrogatories." (Pl. Supp. Reply Br. 15.) Paramount further wondered:

How could Paramount have even legitimately continued to pursue a damages

lenge does not implicate the enforcement of the law against third parties. Rather, a litigant may separately argue that discriminatory enforcement of a speech restriction amounts to viewpoint discrimination in violation of the First Amendment." *Id.* A plaintiff may point to a pattern of discriminatory enforcement to support an as-applied challenge. *See, e.g., Long Beach Area Peace Network v. City of Long Beach,* 574 F.3d 1011, 1029 (9th Cir.2009) (suggesting that an as-applied claim against a statute may lie "if, in its implementation, there emerged 'a pattern of unlawful favoritism.'") (quoting *Thomas v. Chicago Park Dist.,* 534 U.S. 316, 324–25, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002)); *see also S. Or. Barter Fair v. Jackson Cty.,* 372 F.3d 1128, 1140 (9th Cir.2004); *G.K. Ltd. Travel v. City of Oswego,* 436 F.3d 1064, 1084 (9th Cir.2006). A successful as-applied challenge renders only the particular application of the law invalid, not the entire law itself. *Foti,* 146 F.3d at 635.

claim in *Paramount I* if it had not suffered any monetarily compensable injury? What was Paramount to do other than agree that it was not seeking a remedy that it was not entitled to at the time? The fact that it chose not to pursue a claim it did not have cannot be bootstrapped into a perpetual future waiver—especially now that there is a new case, based on new damages, and after an unanticipated subsequent change in the law three years later.

(*Id.*)

Even the Ninth Circuit in its memorandum disposition dismissing the *Paramount I* appeal suggested that there was a lack of damages resulting from the Original Hollywood SUD: "Paramount is not able to demonstrate that any alleged damages it incurred after the district court's order resulted from application of the provisions of the Hollywood SUD challenged in the complaint. Moreover, the City confirmed at oral argument that its post-judgment enforcement actions are based on the versions of the Los Angeles Municipal Code §§ 14.4.4(B)(9) and 14.4.4(B)(11) amended as of August 14, 2009, and that [it] has not, and will not, seek damages on the basis of the provisions eliminated as a result of the September 2010 amendment." (Paramount's June 17, 2011 RJN, Ex. I at 2.) These admissions demonstrate that May 2010 enforcement action broke the chain of causation between the Original Hollywood SUD and Paramount's damages.

To avoid dismissal, Paramount argues that the Original Hollywood SUD was at least one cause of its damages because, without the permits that were allegedly unlawfully denied, it could have erected signs and would not have been subject to the state-court enforcement action. Even assuming this might allege causation-in-fact, no reasonable observer could conclude that Paramount's damages beginning in May 2010 in the face of the state-court enforcement action involving a newly enacted sign ban are proximately caused by the denial of permits years earlier under the Original Hollywood SUD. Because Paramount cannot allege that any damages resulted from any alleged unfettered discretion embodied in the Original Hollywood SUD, this claim must be DISMISSED WITH PREJUDICE.

### E. Claim 6: As–Applied First Amendment Challenge to the Original and Amended SUDs for Favoring Large Companies

■ Paramount alleges that the sign reduction requirement in the Original Hollywood SUD and the "grandfathered" and "vesting" exceptions in the Amended Hollywood SUD operate to favor large companies who own billboard structures and could afford to take down some signs under the sign removal program or purchase "take-down rights" from other entities, which resulted in viewpoint discrimination against speakers who could not afford to participate in the program. This does not state a First Amendment claim. The City was permitted to exercise discretion in creating a sign reduction program to ameliorate blight in the Original Hollywood SUD, so it could validly condition the erection of supergraphic signs on reducing other signage and/or paying a fee to that would achieve a similar purpose. *See World Wide Rush*, 606 F.3d at 686. Paramount fails to demonstrate how this scheme amounts to viewpoint discrimination, when there is no suggestion that the City reviews the content of any proposed supergraphic sign in determining whether to permit it.

■ Paramount also suggests that the Original and Amended Hollywood SUDs are invalid because they did not leave open ample alternative avenues for speech for small companies like Paramount. Howev-

er, a regulation is invalid on this ground only if it forecloses " 'an entire medium of public expression across the landscape of a particular community or setting.' " *G.K. Ltd. Travel*, 436 F.3d at 1074. The restrictions in the Original Hollywood SUD at issue here did not prohibit an "entire medium" · of public expression because it was limited to supergraphic signs and did not even ban all of those; it only prohibited some commercial supergraphic signs for certain companies that were unable or unwilling to comply with the sign reduction or "in lieu" fee requirements. This did not foreclose Paramount (or its advertising clients) from taking advantage of the medium of supergraphic signs to disseminate any messages with another company approved to erect supergraphic signs at permitted locations. Even the Amended Hollywood SUD, which banned all new commercial supergraphic signs, did not overly restrict avenues for speech because even a blanket ban on one type of commercial sign does not foreclose so many avenues of commercial speech that it renders the ban invalid. *See id.* (finding prohibition of "pole" signs left open ample alternative avenues for non-sign-based forms of communication, "such as handbills, radio, television, newspaper, or telemarketing."). Thus, these allegations fail to state a First Amendment violation and must be DISMISSED WITH PREJUDICE.

F. *Claim 7: As–Applied First Amendment Challenge to the Original SUD for Varying Fees for Speakers*

■ Paramount styles this claim as an "as-applied" challenge to the Original Hollywood SUD because the "in lieu" fee required to erect supergraphic signs was an "illegal charge for, and tax on, speech" that carried no standards to fix the amount of fees. To the extent this actually pleads a facial claim that the Original Hollywood SUD lacked standards to cabin officials' discretion to charge discriminatory fees, it fails for the same reasons as Paramount's unbridled discretion claims failed.

To the extent this pleads an as-applied challenge that Paramount was charged a fee in order to speak, it does not state a claim. The court in *Metro Lights* rejected a similar contention that the City had impermissibly " 'auction[ed] off First Amendment rights' to the highest bidder" for the contract to erect signs at transit stops throughout the City. *See* 551 F.3d at 912. The court reasoned that this was just a "repackaged" *Central Hudson* underinclusivity argument that did not result in a situation in which the government had "silence[d] one speaker but not another because the latter has paid a tax, even though it could constitutionally silence both." *Id.* at 913–14. That was because, unlike a tax on speech that would transform an otherwise permissible restriction on speech into merely a revenue-generating scheme, the contract to a single company over the City's street furniture actually furthered the City's interests in traffic safety and aesthetics by giving it control over a single company who posts signs at transit stops. *Id.*

The provisions of the Original Hollywood SUD present as strong a case as *Metro Lights* to reject the "unconstitutional fee" argument. As in *Metro Lights*, the City's interests here were directly furthered through the sign reduction and "in lieu" fee provisions in the Original Hollywood SUD because both requirements helped improve aesthetics and reduce other signage. As a result, any fees charged for erecting supergraphic signs did not transform this otherwise legitimate sign regulation into an impermissible revenue-generating scheme. Moreover, a sign company could avoid paying fees entirely under the Original Hollywood SUD so long as the company reduced other signage,

which directly advanced the City's interests in aesthetics without implicating the issue of unconstitutional fees. Consistent with *Metro Lights*, then, Paramount's claim fails on this basis and must be DISMISSED WITH PREJUDICE.

### G. *Claim 8: As–Applied First Amendment Challenge that the City Improperly Refused Paramount's Permit Requests and Influenced the CRA to Do the Same*

Paramount claims in essence that the City's Planning Department, the Department of Building Safety, and the Fire Department refused to process its permit applications and improperly influenced the CRA to likewise refuse Paramount's permit applications.[10] Paramount fails to explain how these allegations amount to a First Amendment violation because it has not alleged that any City official discriminated based on the content or viewpoint of Paramount's proposed supergraphic signs or even that City officials were aware of the content of the proposed signs. *See Long Beach Area Peace Network*, 574 F.3d at 1020. Thus, for this as-applied challenge, Paramount has failed to allege that "discriminatory enforcement of a speech restriction amounts to viewpoint discrimination in violation of the First Amendment." *Foti*, 146 F.3d at 635.

Moreover, it is clear that the inability of Paramount to obtain permits for its supergraphic signs in the Hollywood SUD stemmed from its refusal to comply with the sign reduction program or enter an agreement with the CRA for "in lieu" fees, not unexplained improper actions or influence of City officials. For example, in support of its claims in the FAC and in opposition to the City's motion to dismiss the FAC, Paramount cited a declaration filed in the Ninth Circuit in *Paramount I* from Pamela K. Anderson, a consultant for Paramount during the permitting process. In that declaration, Ms. Anderson testified under penalty of perjury that Paramount's permit requests were rejected in 2006 because they "did not have a (billboard) 'trade-in' component" and Paramount was "unable to secure an acceptable 'in lieu fee' agreement" with the CRA for permanent supergraphic permits. (Paramount's Jan. 14, 2011 RJN, Ex. F at 133–34, ¶ 11.) Likewise, Paramount cited a declaration filed in the Ninth Circuit in *Paramount I* from Luis F. Magdaleno, another consultant, who testified under oath that he was rebuffed by the City in 2008 because Paramount had not obtained sign reduction credits from the CRA that would have allowed Paramount's proposed supergraphic signs; indeed, the City permitting official told him that "there was no point in attempting to submit a Land Use Permit Application because it would not be accepted without first having the signage removal credits in place" and that he should work with the CRA to obtain those credits. (Paramount's Jan. 14, 2011 RJN, Ex. F at 191–92, ¶¶ 5–6.)[11] Thus, according to Paramount's own consultants, the City refused

---

10. This challenge must be directed at only the Original Hollywood SUD because Paramount does not allege that it applied for permits under the Amended Hollywood SUD. (SAC ¶ 35–36.)

11. The Court previously declined to judicially notice the contents of the Magdelano declaration when Paramount offered the declaration to defeat dismissal of the CRA in this case. (Docket No. 62 at 9 n. 3.) Now offered by the City, the contents of the Anderson and Magde-lano declarations are now undisputed and can be judicially noticed. *See Ritchie*, 342 F.3d at 908–09; *Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir.1994). Indeed, Paramount does not object to the consideration of these documents or argue that it would be permitted to allege facts in the SAC in conflict with these sworn statements. In any case, these documents simply provide more detail surrounding the alleged permit denials in 2008 and 2010. (*See* SAC ¶¶ 26, 32.)

to grant permit applications because Paramount did not comply with the terms of the Original Hollywood SUD, not because any City officials simply "refused" to process permit applications.

Paramount further suggests that personnel in the City Attorney's office improperly influenced City officials and the CRA to deny Paramount's permit applications, while encouraging approval of others. This theory fails because the City Attorney certainly may advise City Departments and officials without violating the First Amendment. (City's Feb. 28, 2011 Supp. RJN, Ex. 13, § 271(b).) Indeed, recognizing this theory of liability would significantly chill the City Attorney's ability to provide candid legal advice.

Finally, the Court rejects Paramount's conclusory suggestion that the City "allowed" the CRA to improperly deny Paramount's permit requests because Paramount has not come close to pleading facts to support a policy or custom that could impose direct liability on the City. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Nor is such a theory legally tenable since the CRA is considered a distinct entity from the City under California law. *See Pac. States Enters., Inc. v. City of Coachella*, 13 Cal.App.4th 1414, 1424, 17 Cal.Rptr.2d 68 (1993) ("Redevelopment agencies are governmental entities which exist by virtue of state law and are separate and distinct from the communities in which they exist."). Thus, Paramount has failed to state a First Amendment claim on this basis and this claim is DISMISSED WITH PREJUDICE.

## H. Claim 9: Facial and As–Applied Challenges to the City's Sign Regulations under the California Constitution

■ Paramount alleges that the California Constitution imposes stricter requirements for regulating commercial speech than the First Amendment, and it claims that the City's Sign Regulations independently violate the California Constitution. The Ninth Circuit rejected this same contention in *Vanguard*, 648 F.3d at 746–47. Because the California Constitution's protection of commercial speech is coextensive with the protection under the First Amendment, Paramount's state constitutional claims fail for the same reasons and must be DISMISSED WITH PREJUDICE.

## I. Claim 10: Declaration of Vested Rights

Paramount alleges that it is entitled to a declaration that it either has vested rights to supergraphic sign permits at the Sunset Properties or that such permits should be considered "grandfathered" under the Amended Hollywood SUD because its permit applications were unlawfully denied. Not only does this contention fail because Paramount has not pled a claim that its permits were wrongfully denied, but the Ninth Circuit also rejected this very argument in *Outdoor Media* when it held that "wrongfully denied" permits do not give rise to vested rights under California law. 506 F.3d at 903. Thus, this claim must be DISMISSED WITH PREJUDICE.

## J. Equal Protection Claims

■ Paramount alleges that the same facts already addressed above also form the basis for an equal protection violation because the City discriminated against it by denying its permit applications while granting the applications of other, similarly situated speakers. Paramount has not alleged that the City discriminated based on the content or viewpoint of any speech or based on a protected characteristic. As was the case with the sign company in *Van-*

*guard*, then, "[b]ecause Plaintiff is not a member of a suspect class, its equal protection claim is subject to rational basis review unless its fundamental right of free speech is implicated." 648 F.3d at 743.

Paramount's equal protection claim fails for reasons similar to those that caused its *Central Hudson* claims to fail. As outlined above, the City's interests were directly advanced by implementing the sign reduction program in the Original Hollywood SUD. The sign companies that were granted permission to erect signs in the Hollywood SUD were allowed to do so because they complied with the sign reduction and "in lieu" fee requirements. When Paramount could not or would not comply with this program for its new supergraphic signs, it was no longer similarly situated to other sign companies that could comply and the City could reasonably preclude its signs while allowing others. And even if Paramount could be considered similarly situated to those other companies that could reduce signage or pay the "in lieu" fees, the City could have reasonably preferred those other companies over Paramount in order to further its interests in the Hollywood SUD.

To the extent Paramount is complaining that it had to pay higher fees or comply with more onerous requirements than other companies, the CRA, and *not* the City, set the fees and other requirements for Paramount under the Original Hollywood SUD and the sign reduction program. (SAC ¶¶ 22–23.) As explained above, Paramount has failed to demonstrate that the City can be held liable for the acts of the CRA pursuant to *Monell* or that the CRA

should not be considered a separate entity under state law. *See Pac. States*, 13 Cal. App.4th at 1424, 17 Cal.Rptr.2d 68.

Paramount cites *Valley Outdoor, Inc. v. City of Riverside*, 446 F.3d 948, 955 (9th Cir.2006), but that case does not preserve Paramount's equal protection claims here. In that case, the court analyzed a "class of one" equal protection theory [12] and allowed a billboard company to present evidence that the city had "arbitrarily, maliciously, and dishonestly den[ied]" its permit applications in retaliation for the company's filing of a permit application during a period of time when the city was legally powerless to prevent erection of the signs requested. *Id.* Here, in contrast, Paramount is not pleading a "class of one" equal protection claim; it has not alleged that the City harbored animosity toward it that fueled the denials of its permit applications. Instead, it points to the allegedly differing treatment of similarly situated sign owners that received approvals for "indistinguishable signage." (SAC ¶ 71.) This is a traditional equal protection claim and Paramount has not pled a violation. Thus, it is DISMISSED WITH PREJUDICE.

### K. *As–Applied Takings Claims*[13]

▪ The Court previously dismissed Paramount's takings claims with leave to amend to address the deficiencies identified by the Court. While Paramount has attempted to replead its as-applied claim, it still fails for the same reasons it failed before.

▪ This claim is based upon two cases from the Supreme Court recognizing a

---

12. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

13. Although Paramount pled claims under both the federal and California constitutions

in the SAC, in the meet-and-confer process, Paramount abandoned the California claim and the Court does not address it. (City's Feb. 28, 2011 Supp. RJN, Ex. 14.)

regulatory takings claim where exactions required by permit conditions lacked a reasonable relationship to the government's asserted interest in requiring the condition. *See Dolan v. City of Tigard,* 512 U.S. 374, 388–89, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); *Nollan v. Cal. Coastal Comm'n,* 483 U.S. 825, 837, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). An as-applied *Dolan/Nollan* claim is subject to the ripeness requirements from *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City,* 473 U.S. 172, 195, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), which require that the plaintiff (1) obtain a final administrative decision applying the regulation to the property at issue and (2) seek compensation through state procedures. *Guggenheim v. City of Goleta,* 638 F.3d 1111, 1117 (9th Cir.2010) (en banc), *cert. denied* —— U.S. ——, 131 S.Ct. 2455, 179 L.Ed.2d 1210 (2011).

 A "final decision" exists when "(1) a decision has been made 'about how a plaintiff's own land may be used' and (2) the local land-use board has exercised its judgment regarding a particular use of a specific parcel of land, eliminating the possibility that it may 'soften[ ] the strictures of the general regulations [it] administer[s].' " *Adam Bros. Farming, Inc. v. Cty. of Santa Barbara,* 604 F.3d 1142, 1147 (9th Cir.2010) (brackets in original; citation omitted). A final decision is required because "only a regulation that goes too far results in a taking under the Fifth Amendment" and "a court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *Id.* (internal quotation marks omitted).

 The second *Williamson* requirement is satisfied when the plaintiff brings a claim in state court, requesting just compensation for the alleged taking. *Id.* "This requirement exists because the 'Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation,' " and "[i]t is not until a party seeks and is denied just compensation from the state that a constitutional violation occurs." *Id.* In California, that requires a plaintiff bringing an as-applied regulatory takings claim based on land-use conditions to file a petition for a writ of mandamus in state court to determine whether the conditions are permissible, which gives the municipality the opportunity to withdraw those conditions if found to be invalid to avoid compensating the plaintiff. *See Hensler v. City of Glendale,* 8 Cal.4th 1, 14, 32 Cal.Rptr.2d 244, 876 P.2d 1043 (1994). Thus, "[a] California landowner, who believes that application of a state statute or local ordinance limiting development of the owner's property works a taking, may not bypass the remedies the state has made available to avoid the taking." *Id.* at 19, 32 Cal.Rptr.2d 244, 876 P.2d 1043.

Paramount has once again only alleged an unripe takings claim. First, Paramount has not alleged that it obtained a final determination of the conditions for a supergraphic sign permit from the CRA when it sought one in 2006. Paramount simply alleges that it "approached" the CRA in 2006 about erecting supergraphic signs and was given certain conditions by the CRA for the granting of those permits. There is no suggestion that this was in any way the CRA's final offer of conditions or that Paramount sought to have any of these conditions altered through any formal procedure. Second, Paramount does not allege that it ever sought any sort of compensation for the conditions imposed by the CRA through state court.

While Paramount claims without explanation that it satisfies the *Williamson* ripeness requirements (Opp'n 24), the crux of its argument is that the Court should simply ignore the ripeness requirements

for this claim because these requirements are prudential. *See Guggenheim,* 638 F.3d at 1117–18 (assuming without deciding that claim was ripe because ripeness considerations were prudential); *see also Adam Bros.,* 604 F.3d at 1148 (same).

Paramount alleges three reasons why ripeness should be ignored here: "(1) because of the long and complex history of this case and current posture of the various litigations between the parties, it would be extremely inefficient and wasteful of the parties' and the Court's resources to 'bounce the case through more rounds of litigation,' [citing *Guggenheim,* 638 F.3d at 1118]; (2) the facts relevant to this claim are inextricably intertwined with the facts relevant to Plaintiffs' other claims and should therefore be tried in conjunction with each other; [and] (3) the facts relevant to this claim are settled and well-defined and this claim is, therefore, fully ripe and ready for adjudication by this Court." (SAC ¶ 85.) The Court is not satisfied that these considerations counsel in favor of waiving ripeness requirements here.

Paramount's first contention rings hollow because it was the one that filed two successive federal lawsuits over the same two locations for supergraphic signs, which created the "long and complex" history between the parties. Moreover, Paramount did not even assert a takings claim until it filed the FAC in October 2010, more than two years after the case was originally filed, so it cannot claim that the long history of this litigation provides a ground to ignore the ripeness of a claim it has only recently alleged. And the Court can identify nothing "wasteful" about re-quiring Paramount to seek compensation in state court before returning to this Court, given that the Court has dismissed the rest of its claims with prejudice and a state-court decision could relieve this Court of the need to spend further scarce judicial time and resources on Paramount's claims.

Paramount's second contention is likewise unpersuasive because, again, nothing remains of this case, so even if the facts are intertwined, they will not be "tried in conjunction with each other," as Paramount alleges.

Finally, Paramount's third contention lacks merit because the facts relevant to its takings claim are not settled or well-defined. A *Dolan/Nollan* takings claim arises only in cases involving "adjudicative, individual determinations conditioning permit approval on the grant of property rights to the public." *McClung v. City of Sumner,* 548 F.3d 1219, 1227 (9th Cir. 2008). Paramount alleges that only some of the conditions imposed by the CRA "presumably" served public purposes, such as dedicating a level of parking and constructing an additional level of parking at the Sunset Properties. (SAC ¶¶ 82.) Had Paramount progressed further in negotiations with the CRA, these or other conditions might have been eliminated and, if not, Paramount could have filed a petition for a writ of mandamus in state court to determine whether the conditions were permissible, which would have given the CRA the opportunity to withdraw those conditions. *See Hensler,* 8 Cal.4th at 14, 32 Cal.Rptr.2d 244, 876 P.2d 1043. Thus, the Court finds that these claims are unripe and must be dismissed.[14]

---

**14.** Even assuming the takings claim is ripe as Paramount urges, it fails because the CRA imposed the challenged permit conditions, not the City, and the City cannot be held liable for the CRA's actions. *See Pac. States,* 13 Cal.App.4th at 1424, 17 Cal.Rptr.2d 68 (1993); *see also Oceanside Marina Towers Ass'n v. Oceanside Cmty. Dev. Comm'n,* 187 Cal.App.3d 735, 741, 231 Cal.Rptr. 910 (1986); *Nolan v. Redev. Agency of City of Burbank,* 117 Cal.App.3d 494, 499–501, 172 Cal.Rptr. 797 (1981). Thus, this claim must be DISMISSED WITH PREJUDICE.

## CONCLUSION

For the reasons discussed above, all of Paramount's claims fail and this case must be DISMISSED in its entirety.[15] Although Paramount requests leave to amend the SAC, many of Paramount's claims are legally deficient, rendering any amendment futile, and Paramount has already had several chances to amend. Therefore, the SAC must be dismissed WITH PREJUDICE. *See City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 454 (9th Cir.2011); *see also Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1058 (9th Cir.2011) (noting that the " 'district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint.' ").[16]

The City is ORDERED to lodge a proposed judgment dismissing this case **within 10 days of the date of this Order.**

**IT IS SO ORDERED.**

---

**15.** The parties agree that Paramount's 42 U.S.C. § 1983 claim is merely pled as a vehicle to assert constitutional claims for damages and injunctive relief. Thus, it fails as well.

**16.** In its supplemental briefs, Paramount requested that the Court stay this case because there is a possibility of en banc or Supreme Court review in *Paramount I* and *Vanguard*. That request is DENIED.